**In re OODC, LLC f/k/a Optical Datacom, LLC, Debtor.**

**Frederick B. Rosener as Chapter 11 Trustee for OODC, LLC, Plaintiff,**

v.

**Majestic Management, Inc., et al., Defendants.**

**Frederick B. Rosener as Chapter 11 Trustee for OODC, LLC, Plaintiff,**

v.

**U.S. Bank National Association (as successor to Firstar Bank, N.A.), et al., Defendants.**

Bankruptcy No. 01–11322(WS). Adversary Nos. 03–58583(MFW), 02–2274 (MFW).

United States Bankruptcy Court, D. Delaware.

March 2, 2005.

Joel A. Waite, Englewood, CO, for debtor.

## OPINION[1]

MARY F. WALRATH, Bankruptcy Judge.

This matter is before the Court on various Motions to Dismiss (or for a More Definitive Statement) relating to two Complaints filed by the Trustee. The Motions are opposed by the Trustee. For reasons set forth below, we will deny the Motions.

### I. FACTUAL BACKGROUND

On November 16, 2001, Optical Datacom, LLC ("the Debtor") filed a voluntary petition under chapter 11 of the Bankruptcy Code. Shortly after filing, the Debtor sold substantially all of its assets for approximately $7.5 million. Since the Debtor had no remaining operations, the Official Committee of Unsecured Creditors filed a

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

Motion for the appointment of a trustee. The Debtor did not oppose that Motion, and Frederick Rosner ("the Trustee") was appointed on March 8, 2002.

On April 1, 2002, and November 12, 2003, the Trustee filed two Complaints seeking to undo the leveraged buyout ("the LBO") which had created the Debtor. The facts surrounding the LBO are detailed in the Trustee's Complaints which allege, inter alia: In February 2001, the Debtor was formed to purchase the assets of Majestic Management, Inc. ("MMI"), Optical Datacom, Inc. ("ODI"), Majestic Management of Georgia, LLC ("MMI–Georgia") and a one-third ownership interest in Conway Communications Company, LLC, ("Conway") (collectively, "the Selling Companies"). The Selling Companies were owned by Larry Large ("Large") and his relatives; Large became the largest preferred equity holder in the Debtor's parent. Orlando Carter ("Carter") was an officer and director of one or more of the Selling Companies and became an officer of the Debtor and the sole voting member of the Debtor's parent.

The purchase was financed by Firstar Bank, N.A., First Bank, GE Capital Commercial Finance, Inc., IBM Credit Corp. and Wachovia Bank, N.A. (collectively, "the Bank Group") which extended over $60 million in loans to the Debtor in connection with the LBO. The Bank Group was aware of the Debtor's intent to purchase the assets of the Selling Companies and, in fact, one of the conditions precedent in the loan agreement was that the Bank Group be given copies of the board resolutions of the Selling Companies which authorized the sale. To secure the loans, the Bank Group obtained a security interest in the assets of the Selling Companies.

Pursuant to the LBO, the Debtor assumed certain liabilities of the Selling Companies, in addition to paying a cash price of $69.5 million. That money was subsequently transferred by the Selling Companies to their shareholders or affiliates.

In his Complaints, the Trustee asserts claims against the Defendants as a result of the LBO for fraudulent transfers under the Bankruptcy Code and state law, breach of fiduciary duty (or aiding and abetting such a breach), breach of representations and warranties and unjust enrichment. The Trustee also brings a claim against the Bank Group for improvident lending and seeks equitable subordination of their secured claims.

The Bank Group previously filed a Motion for Judgment on the Pleadings. A hearing was held on that Motion on May 16, 2003, at which time we denied the Motion and granted leave to the Trustee to amend the Complaint. Subsequent to the filing of the Amended Complaint, the Bank Group filed its Motion to Dismiss. Motions to Dismiss or for a More Definitive Statement have also been filed by all the other Defendants except Conway (collectively with the Bank Group, "the Moving Defendants"). The parties have fully briefed the issues. Because the facts and issues raised by the Motions are similar, we decide them together.

## II. *JURISDICTION*

This Court has jurisdiction over this adversary, which is a core proceeding pursuant to 28 U.S.C. §§ 1334 & 157(b)(2)(A), (E), (F), (H), & (O).

## III. *DISCUSSION*

### A. *Motion to Dismiss Standard*

In reviewing a Motion to Dismiss, the court must accept the facts in a well-pleaded complaint as true. *Carino v. Stefan,* 376 F.3d 156, 159 (3d Cir.2004). Moreover, the court must view the allegations "in a light most favorable" to the nonmoving party to determine, if proven, whether they form a basis for possible relief. *Id.* Granting a motion to dismiss is a "disfavored" practice, and the court should grant the motion only if it finds that the plaintiff cannot prove any set of facts upon which relief may be granted. *DuFrayne v. FTB Mortgage Servs., Inc. (In re DuFrayne),* 194 B.R. 354, 361 (Bankr.E.D.Pa.1996). Moreover, in evaluating a motion to dismiss, the issue is not whether the complainant will ultimately prevail but rather whether the complainant is entitled to offer evidence in support of his claim. *Maio v. Aetna, Inc.,* 221 F.3d 472, 482 (3d Cir.2000) (citations omitted).

### B. *Collapsing Theory*

The Trustee's Complaints are premised on the theory that the Court should "collapse" into one integrated transaction the series of transactions in which (1) the Debtor borrowed funds from the Bank Group; (2) the Debtor purchased the assets of the Selling Companies; and (3) the Selling Companies transferred the proceeds to its shareholders and affiliates. The Trustee asserts that this is mandated because the transactions were a scheme by the parties to defraud the estate and its creditors. *See, e.g., United States v. Tabor Court Realty Corp.,* 803 F.2d 1288, 1302 (3d Cir.1986) (holding that loan proceeds which were passed through the borrowers to the target company and ultimately to the target company's shareholders should be viewed as one integrated transaction); *Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488, 502 (N.D.Ill.1988) (leveraged buyout transfers would be collapsed into one transaction for purposes of considering fraudulent conveyance action against shareholders and lenders).

The Moving Defendants argue that the Trustee's Complaint is legally flawed for several reasons: (1) the alleged harm was suffered by the Selling Companies' creditors, if anyone, and they are not represented by the Trustee; (2) the Trustee cannot simply collapse the Debtor into the Selling Companies when the two were distinct unrelated entities; and (3) if the entire series of transactions is undone, the Debtor should be left as it was in the beginning, with nothing.

### 1. *Harm to Creditors*

██  The Moving Defendants assert that the Trustee is really seeking to pursue causes of action belonging to the unsecured creditors of the Selling Companies, which he has no standing to assert. In fact, they note there is an inherent conflict between the unsecured creditors of the Debtor and the unsecured creditors of the Selling Companies: the former would have wanted the Debtor to pay less for the assets and the latter would have wanted the Debtor to pay more for the assets. Thus, the Moving Defendants argue that the Trustee cannot represent the creditors of the Selling Companies. In addition, at the time of the transaction, the Debtor was a shell corporation with no assets and no creditors. Therefore, the Moving Defendants argue that there are no unsecured creditors for whom the Trustee can assert his claim.

The Trustee contends, however, that there are creditors (and an estate) whom he represents and who have a cause of action against the Defendants. He asserts that the point of the collapsing theory is to view the transaction as a whole to determine the overall economic effect on the Selling Companies and their creditors (because the Debtor is their successor). *See, e.g., Crowthers McCall Pattern, Inc. v. Lewis,* 129 B.R. 992, 998 (S.D.N.Y.1991) (holding that, for purposes of fraudulent conveyance analysis, transaction must be viewed from the perspective of the creditors of the target—or selling—corporation).

The Trustee also notes that the Debtor expressly assumed the Selling Companies' liabilities to their unsecured creditors. Consequently, the Trustee argues the Selling Companies' unsecured creditors became unsecured creditors of the Debtor as well.

While the Moving Defendants acknowledge that the Debtor agreed to pay the Selling Companies' unsecured creditors, they argue that this does not mean that those creditors have privity to assert their claims against the Debtor. *See, e.g., Kradel v. Fox River Tractor Co.,* 308 F.3d 328, 331 (3d Cir.2002) (holding that generally, when one company transfers its assets to another, transferee does not become liable for transferor's debts); *Guardian Constr. Co. v. Tetra Tech. Richardson, Inc.,* 583 A.2d 1378, 1386 (Del.Super.Ct.1990) (finding that third party does not have right to sue under contract to which he is not a party unless he is intended third party beneficiary). In fact, they assert that the asset purchase agreements between the Debtor and the Selling Companies specifically stated that no third party was an intended beneficiary.

However, the Third Circuit has explained that:

> At common law, where one corporation sells or transfers all or a substantial part of its assets to another, the transferee does not become liable for the debts and liabilities, including torts, of the transferor. There are certain exceptions to that general rule. A purchaser may be liable where it expressly assumes liability, the transaction amounts to a consolidation or merger, the transaction is fraudulent and intend-

ed to escape liability, or the purchaser is a mere continuation of the seller.

*Brzozowski v. Corr. Physician Servs., Inc.,* 360 F.3d 173, 177 (3d Cir.2004) (citations omitted). *See also, Aluminum Co. of Am. v. Beazer East, Inc.,* 124 F.3d 551, 565 (3d Cir.1997) (imposing liability for environmental cleanup on holding corporation that acquired all of facility's assets and assumed all liabilities and obligations).

In the instant case, the Trustee has alleged facts that implicate all of the exceptions to the general rule against successor liability. First, the Trustee alleges that the Debtor expressly assumed the liabilities of the Selling Companies in the asset purchase agreements. Second, the Trustee alleges the transactions were, in essence, a merger of the Selling Companies and the Debtor because all the operations were transferred to the Debtor and the Selling Companies were dissolved. Third, the Trustee alleges the transaction was fraudulently conducted in an effort by the Selling Companies to avoid liability to their unsecured creditors. Finally, the Trustee asserts the Debtor is merely a continuation of the Selling Companies. Those allegations are sufficient to support a claim under *Brzozowski* that the Debtor is liable to the unsecured creditors of the Selling Companies.

The Moving Defendants assert, however, that claims of the unsecured creditors under successor liability theories are personal to them and cannot be prosecuted by the Trustee. *See, e.g., Mixon v. Anderson (In re Ozark Rest. Equip. Co., Inc.),* 816 F.2d 1222, 1229 (8th Cir.1987); *PHP Liquidating, LLC v. Robbins,* 291 B.R. 592, 599 (D.Del.2003). However, the *Ozark* decision was predicated on Arkansas state law, which the Court found did not allow a corporation to bring an action to pierce the corporate veil. *Ozark,* 816 F.2d at 1225.

Further, the *Ozark* decision is by no means the majority view. In fact, most other courts have found that the trustee in bankruptcy has standing to bring successor liability (or alter ego) suits on behalf of all creditors. *See, e.g., St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.,* 884 F.2d 688, 703–04 (2d Cir.1989) ("We believe that, under Ohio law, a corporation would be able to assert an alter ego cause of action against its parent corporation. The cause of action therefore becomes property of the estate of a bankrupt subsidiary, and is properly asserted by the trustee in bankruptcy."); *Koch Ref. v. Farmers Union Cent. Exch., Inc.,* 831 F.2d 1339, 1350 (7th Cir.1987) (trustee has standing to bring alter ego claim under equitable subordination provisions of section 510); *Tsai v. Bldgs. by Jamie, Inc. (In re Bldgs. by Jamie, Inc.),* 230 B.R. 36, 43 (Bankr.D.N.J. 1998) ("The majority of the courts in other jurisdictions that have addressed the issue of authority to pursue an alter ego action on behalf of a corporate debtor have also held that the trustee has standing.").

The Eleventh Circuit articulated what appears to be the majority view: "Like many courts that have addressed this issue, we hold that in order to bring an exclusive alter ego action under section 541, a bankruptcy trustee's claim should (1) be a general claim that is common to all creditors and (2) be allowed by state law." *Baillie Lumber Co., LP v. Thompson,* 391 F.3d 1315, 1321 (11th Cir.2004).

In this case, the allegations of the Trustee are that all the unsecured creditors of the Selling Companies and the Debtor were harmed by the LBO. Therefore, it is a general claim that is common to all the unsecured creditors. The parties have cited no state law which would bar such a suit by the Trustee or the Debtor on behalf of all creditors. Further, the argument that the corporation cannot bring an

alter ego suit is an affirmative defense, which is not grounds for dismissal of the action at this stage. *See, e.g., Official Comm. of Unsecured Creditors & R2 Invs. v. Credit Suisse First Boston (In re Exide Techs., Inc.)*, 299 B.R. 732, 752 (Bankr. D.Del.2003) (citations omitted) ("*In pari delicto* is an affirmative defense. A plaintiff is not required to plead in the complaint all requirements for a claim as well as contemplate and plead in anticipation of all affirmative defenses that may lie against such claim.").

■ Consequently, we conclude that the Trustee has standing to bring these actions on behalf of the unsecured creditors (originally of the Selling Companies and, as a result of the LBO, currently of the Debtor). Section 548 of the Bankruptcy Code gives the Trustee standing to bring such a fraudulent conveyance action on behalf of the estate. *See* 11 U.S.C. § 548(a)(1)(A) (allowing avoidance of transfer if it is fraudulent as to any entity who was or became a creditor as a result of the transfer). *See also, Aluminum Mills Corp. v. Citicorp North America, Inc. (In re Aluminum Mills Corp.)*, 132 B.R. 869, 884 (Bankr.N.D.Ill.1991) (holding that trustee has standing to bring fraudulent conveyance action on behalf of all creditors of the estate under sections 548 and 541). The trustee is given broad powers under the Bankruptcy Code to carry out his duties, which "include, but are not limited to, investigating the debtor's financial affairs, suing officers, directors and other insiders to recover, on behalf of the estate, fraudulent and preferential transfers and operating the business under the supervision of the court." *Hechinger Inv. Co. of Del. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del.)*, 285 B.R. 601, 610–11 (D.Del.2002). In the instant case, the Trustee seeks to recover, on behalf of the estate, property of the estate

which he asserts was fraudulently transferred to the Defendants. We conclude that the Trustee has standing to bring this action.

### 2. *Collapsing Entities*

The Moving Defendants also argue that the Trustee cannot state a claim under his collapsing theory. They assert that even if collapsing a series of transactions is appropriate, it is not appropriate to collapse separate legal entities into one. They argue that the Debtor and the Selling Companies were separate entities which were owned and operated independently. They contend that the only connections between the Selling Companies and the Debtor alleged by the Trustee were that: (1) Carter was president of one of the Selling Companies and became the president of the Debtor and the sole voting member of the Debtor's parent; and (2) Large was a majority shareholder of one of the Selling Companies and became a non-voting shareholder in the Debtor's parent.

■ In appropriate circumstances courts may view a series of transactions (such as those involved in a leveraged buyout) as one integrated transaction. *See, e.g., HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir.1995); *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1064 (3d Cir.1992); *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 645–46 (3d Cir.1991); *Tabor Court*, 803 F.2d at 1302; *Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del. Inc. v. Fleet Retail Fin. Group (In re Hechinger Inv. Co. of Del.)*, 274 B.R. 71, 81–82 (D.Del.2002); *MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F.Supp. 913, 934–935 (S.D.N.Y. 1995).

The Bank Group contends that the Trustee has misapplied the "collapsing theory"

to the facts of this case because prior cases have applied the theory to stock redemption or cash-out mergers only and not to asset purchases, such as in this case. They argue that the collapsing theory should not be applied in asset purchase cases because the nature of the transaction ensures that reasonably equivalent value is given and because its application would expose "every asset purchase arrangement to potential avoidance."

The Trustee responds that courts have accepted the "collapsing theory" of fraudulent conveyances even where the leveraged buyout was not a stock sale, but was an asset sale. *See, e.g., Aluminum Mills,* 132 B.R. at 884 (denying motion to dismiss complaint alleging asset sale leveraged buyout was a fraudulent conveyance). *See also, MFS/Sun Life,* 910 F.Supp. at 934 ("Policy issues aside, there is nothing in the language of fraudulent conveyance statutes that renders them inapplicable to LBOs.").

The Moving Defendants argue that the *Aluminum Mills* case is the only case allowing a fraudulent conveyance action to proceed in an asset-sale leveraged buyout and was wrongly decided.[2] Even if it is good law, Large argues that it is factually distinguishable from his case because in *Aluminum Mills* the defendant was a large shareholder and an officer of the debtor as well as the selling company while Large has no such position with the Debtor.

■ We disagree with the Moving Defendants' argument and find the *Aluminum Mills* analysis persuasive. In deciding whether to "collapse" a series of transactions into one integrated transaction, the issue is not whether there was common ownership on both sides of the transaction or whether the transfer was a stock or an asset sale, but rather whether there was an overall scheme to defraud the estate and its creditors by depleting all the assets through the use of a leveraged buyout. *See, e.g., Hechinger,* 274 B.R. at 91; *In re Best Prods., Co., Inc.,* 157 B.R. 222, 229 (Bankr.S.D.N.Y.1993) (holding that, to determine whether to collapse transactions, focus must be on the parties' intent not on the form of the transaction); *Wieboldt Stores,* 94 B.R. at 502 ("[C]ourt should focus not on the formal structure of the transaction but rather on the knowledge or intent of the parties involved in the transaction"). While common ownership or intricate inter-connections between the buyer and seller may be indicative of a collusive effort, it is not the only means by which parties may seek to defraud the estate. *See generally,* Richard M. Cieri, et al., *An Introduction to Legal and Practical Considerations in the Restructuring of Troubled Leveraged Buyouts,* 45 Bus. Law. 333, 358 (1989).

■ In this case, the Trustee has alleged that the LBO, including the entire series of asset purchases and transfer of funds after the sales concluded, was orchestrated by the Moving Defendants with the intent to defraud the Debtor and its creditors. We find that the Trustee's allegations, if proven, would justify viewing all the transactions involved as one integrated transaction.

---

**2.** The Moving Defendants cite two bankruptcy handbooks which suggest that fraudulent conveyance law should not be extended to asset-sale leveraged buyouts. However, they concede that at least one commentator agrees with the Trustee's theory and the *Aluminum Mills* case. *See e.g.,* Richard M. Cieri, et al.,

*An Introduction to Legal and Practical Considerations in the Restructuring of Troubled Leveraged Buyouts,* 45 Bus. Law. 333, 358 (1989) (arguing that the collapsing theory is as applicable to asset sale leveraged buyouts as it is to stock sale leveraged buyouts).

### 3. *Debtor Gets Nothing*

■ The Moving Defendants argue that the Trustee's Complaints should be dismissed because the ultimate effect of undoing the transaction is to put the Debtor back where it began: with nothing.

We disagree. The effect of applying the collapsing theory is to look at the series of transactions as a whole. The Court is required to view the LBO from the perspective of the unsecured creditors of the transferor (the Selling Companies) who ultimately become creditors of the transferee (the Debtor). *See, e.g., Crowthers McCall*, 129 B.R. at 998. *See generally,* Raymond J. Blackwood, *Applying Fraudulent Conveyance Law to Leveraged Buyouts*, 42 Duke L.J. 340, 362 (1992).

The Trustee in this case alleges that the effect of the series of transactions was to transfer assets of the Selling Companies to the Debtor and to impose $40 million in additional secured debt on the enterprise. Nothing was added to benefit the enterprise or the unsecured creditors as a result of the LBO. Therefore, the Trustee asserts that the transaction as a whole is avoidable because it was done with the intent to defraud the unsecured creditors of the Selling Companies (later of the Debtor) and because no consideration was given to the Debtor for incurring the additional secured debt. Undoing the transaction would leave the Selling Companies and

their creditors where they began, with all their assets and without the secured debt.

We agree with the Trustee that there is support for the theories on which his Complaints are founded and the relief requested. Therefore, we find it inappropriate to dismiss the Complaints.

### C. *Actual Fraud*

■ The Trustee alleges in the Complaints that the transfer of the $69.5 million to the Selling Companies and the grant of a security interest in the Debtor's assets for the $40 million loan was done with the intent to hinder, delay or defraud unsecured creditors. Therefore, the Trustee asserts these transactions are avoidable as actually fraudulent pursuant to section 548(a)(1)(A) [3] of the Bankruptcy Code. Additionally, the Trustee asserts that these transactions are avoidable by him under section 544(b)(1) of the Bankruptcy Code which permits a trustee to avoid any transfer that is voidable by an unsecured creditor under applicable non-bankruptcy law.[4]

The Moving Defendants seek to dismiss these counts on the grounds that the Trustee has failed to plead fraud with the requisite particularity. Generally, a complaint only requires a "short and plain" statement of the claim that will put the defendant on notice of the plaintiff's claim and the grounds upon which the claim rests. Fed. R. Bankr.P. 7008(a). *See also,*

---

**3.** Section 548(a)(1)(A) of the Bankruptcy Code states:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with the actual intent to hinder, delay or defraud any entity to which the debtor was or became . . . indebted.

11 U.S.C. § 548(a)(1)(A).

**4.** The Trustee relies on section 38–8–105(1)(a) of the Colorado Statute which states:

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(a) With actual intent to hinder, delay, or defraud any creditor of the debtor. . . .

Colo.Rev.Stat. Ann. § 38–8–105(1)(a).

*TWA Inc. Post Confirmation Estate v. Marsh USA, Inc. (In re TWA Inc. Post Confirmation Estate)*, 305 B.R. 228, 232 (Bankr.D.Del.2004) (citing *Conley v. Gibson*, 355 U.S. 41, 41–45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). This is a relatively low bar for the plaintiff to hurdle.

▮▮▮▮ In contrast, fraud must be pled with particularity. Fed. R. Bankr.P. 7009. *See also, Pardo v. Gonzaba (In re APF Co.)*, 308 B.R. 183, 188 (Bankr.D.Del.2004). The purpose of the rule is to "place the defendants on notice of the precise misconduct with which they are charged." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984). To state a claim for fraud, however, all the plaintiff need do is inform the defendant of the particular conduct which is alleged to have been fraudulent. *Id.* This requirement is relaxed even more when the plaintiff is a third party, such as a trustee, because a third party generally has less information on which to base its allegation. *APF*, 308 B.R. at 188; *Aluminum Mills*, 132 B.R. at 883 n. 10 (finding that creditors' committee met Rule 9(b) requirements by pleading "upon information and belief" the "specific injuries it seeks to redress, namely the assertedly fraudulent and preferential transfers and breaches of fiduciary duty ... and the legal theories upon which it bases said claims.").

Courts have acknowledged that it is often difficult to prove actual intent to defraud. Consequently, they have held that "certain 'badges of fraud' can form the basis for a finding of actual intent to hinder, delay or defraud." *Wieboldt Stores*, 94 B.R. at 504. Those badges of fraud include: "(1) a close relationship among the parties to the transaction; (2) a secret and hasty transfer not in the usual course of business; (3) inadequacy of consideration; (4) the transferor's knowledge of the creditor's claim and the transferor's inability to pay it; (5) the use of dummies or fictitious parties; and (6) retention of control of property by the transferor after the conveyance." *MFS/Sun Life*, 910 F.Supp. at 935 (citations omitted).

The Trustee's Complaints detail each of the transactions involved in the LBO which form the basis of his allegations of fraud. He has alleged a close relationship between the Selling Companies and the Debtor (Carter was an officer and Large was an owner of the Selling Companies, and both became owners of the parent of the Debtor). The LBO clearly was not a transaction in the ordinary course of the parties' business. The Trustee alleges that the Defendants were aware of the creditors' claims and that the LBO would leave the Debtor with too much debt, making it unable to pay those claims. Accordingly, we find that the Trustee's Complaints sufficiently put the Defendants on notice of the precise misconduct alleged. Therefore, the Motions to Dismiss and for a More Definitive Statement as to the fraud count of the Complaints will be denied.

### D. *Constructive Fraud*

▮▮▮ The Trustee also alleges in the Complaints that the Debtors failed to receive "reasonably equivalent value" for the $69.5 million purchase price paid for the assets and the $40 million in additional secured debt imposed on the Debtor's assets. The Trustee alleges that the Defendants knew or should have known that the "remaining property and assets, after distribution to the selling shareholders, were unreasonably small in relation to the amounts due pursuant to said business and that it would be beyond its ability to pay its existing and maturing debts." Therefore, the Trustee asserts the transactions

are avoidable pursuant to section 548(a)(1)(B)[5] and applicable state law.[6]

The Moving Defendants seek to dismiss these counts as well, arguing that the facts alleged in the Trustee's Complaints are insufficient to state a claim that the Debtor received "less than reasonably equivalent value" from the Selling Companies or from the loans extended by the Bank Group. The Moving Defendants contend that the Trustee merely asserts that the Debtor used the loan proceeds to buy the assets of the Selling Companies and pledged those assets as security for the loans from the Bank Group. They argue that this is insufficient to establish that the Debtor received "less than reasonably equivalent value." Specifically, the Moving Defendants argue that the Trustee ignores the fact that the Debtor received valuable assets from the Selling Companies and substantial money from the Bank Group's loans in exchange for the security interests granted. They argue that it was the collapse of the telecom industry, not the LBO, which caused the Debtor's financial woes.

A plaintiff need not prove his case in a complaint. When reviewing a motion to dismiss, the court need not rule on the merits of the allegations or the defenses to those allegations, but rather only whether the plaintiff is entitled to offer evidence in support of his allegations. *Maio*, 221 F.3d at 482. Here, we are satisfied that the Trustee has alleged sufficient facts to support his claim.

The Trustee alleges that the Selling Companies' assets were artificially inflated in order to increase the amount of financing available to the Debtor. He asserts that the purpose of the loans was to funnel money through the Debtor to the Selling Companies' shareholders. In essence, the Trustee alleges that the Debtor paid too much for the assets that it purchased and, by borrowing the funds, over-secured those assets beyond what it was able to repay. Whether too much was in fact paid for the assets of the Selling Companies is a factual question which does not need to be resolved on a motion to dismiss. *See e.g., Levitt v. Riddell Sports (In re MacGregor Sporting Goods, Inc.)*, 199 B.R. 502, 513 (Bankr.D.N.J.1995); *Ferrari v. Family*

5. Section 548(a)(1)(B) states in relevant part:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

. . . . .

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation....

11 U.S.C. § 548(a)(1)(B).

6. Section 38–8–106 of the Colorado Statute provides:

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a

creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation....

Colo.Rev.Stat. Ann. § 38–8–106.
Section 38–8–105(1)(b) of the Colorado Statute provides:

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: ...

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation....

Colo.Rev.Stat. Ann. § 38–8–105(1)(b).

*Mut. Sav. Bank (In re New Era Packaging, Inc.)*, 186 B.R. 329, 333 (Bankr. D.Mass.1995). We find the allegations, if proven, would provide the basis for a claim for constructive fraud. Accordingly, the Motions to Dismiss and for a More Definitive Statement as to the constructive fraud count of the Complaints will be denied.

### E. *Breach of Fiduciary Duty*

In his Complaints, the Trustee alleges that Carter and/or Large, as directors, officers and controlling entities of the Debtor owed it a fiduciary duty of care, loyalty and good faith. He also asserts that the Bank Group knowingly assisted Carter, Large and the other directors and members of the Debtor and its parent in breaching their fiduciary duties to the Debtor.

#### 1. *Large*

■ Defendant Large asserts, however, that the Trustee has failed to allege that he held any fiduciary positions with the Debtor, because he held no such positions. Consequently, Large argues that he did not owe a fiduciary duty of any kind to the Debtor.

While it is conceded by the Trustee that Large was not an officer, director or majority shareholder of the Debtor, the Trustee alleges that Large had, in fact, exercised actual control over the business dealings of the Debtor and that he was a "principal player" in "formulating and consummating the LBO." Moreover, the Trustee alleges that Large knew or should have known that the LBO would render the Debtor insolvent, that he failed to adequately investigate the effect of the LBO on the Debtor and that Large "directly benefitted" from the LBO.

While the Trustee has not alleged that Large was a director or officer of the Debtor, he has pled sufficient facts to support a finding that Large was a "control-ling shareholder" of the Debtor through his close ties with Carter and his preferred interest in the Debtor's parent. Actual control can be proven if the plaintiff shows that the defendant held a "dominant" position and/or actually "controlled" the corporation's conduct.

"Control" and "domination" are here used in the ordinary meaning of the words and they may be exercised directly or through nominees. But, at minimum, the words imply (in actual exercise) a direction of corporate conduct in such a way as to comport with the wishes or interest of the corporation (or persons) doing the controlling.

*Kaplan v. Centex Corp.*, 284 A.2d 119, 123 (Del.Ch.1971).

Consequently, we find that the Trustee has pled sufficient facts which, if proven, would support a claim against Large for breach of the fiduciary duties of loyalty and good faith as a person in control of the Selling Companies and the Debtor. Accordingly, Large's Motion to Dismiss and for a More Definitive Statement will be denied.

#### 2. *The Bank Group*

##### a. *Time-barred*

■ The Bank Group asserts initially that this count and the count for improvident lending are time-barred. It argues that the final cash collateral order established April 1, 2002, as the bar date for the Official Committee of Unsecured Creditors or any subsequently appointed trustee to object to or otherwise challenge the prepetition liens and security interests of the Bank Group in the collateral. The Bank Group contends that, while the Original Complaint against them was timely filed, the Amended Complaint which added these new counts was not.

■ The Trustee argues that the counts relate back to the Original Complaint because these claims arise out of the "conduct, transaction or occurrence" alleged in the Original Complaint. Fed. R. Bankr.P. 7015(c)(2) (amendment of complaint relates back to date of original complaint when new claim asserted arises out of the "conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading."). A claim arises out of the original "conduct, transaction or occurrence" if there is a factual nexus between the original pleading and the amended pleading so as to put the defendant on notice of what he needs to defend. *See, e.g., Peltz v. CTC Direct, Inc. (In re MBC Greenhouse, Co.),* 307 B.R. 787, 790–92 (Bankr.D.Del.2004); *Gibbons v. First Fid. Bank, N.A. (In re Princeton–New York Investors, Inc.),* 199 B.R. 285, 290 (Bankr.D.N.J.1996); *Flexi–Van Leasing, Inc. v. Perez (In re Perez),* 173 B.R. 284, 290 (Bankr.E.D.N.Y.1994).

In the instant case, the factual allegations underpinning the new counts against the Bank Group are identical to the allegations that supported the Original Complaint. Therefore, we conclude that they relate back to that Complaint. Fed. R. Bankr.P. 7015(a) (stating that leave to amend a pleading should be "freely given when justice so requires.").

■ Despite this liberal policy, courts will deny leave to amend a pleading if there is a showing of undue delay, bad faith, dilatory motive, prejudice or futility. *See, e.g., TWA Inc.,* 305 B.R. at 233. The Bank Group contends there was undue delay and bad faith because the Trustee was aware of the facts that support the additional counts at the time of the original filing and thus should not be permitted to add them now. We do not find any evidence of undue delay or bad faith on the part of the Trustee in not pleading them

originally. Further, there is no prejudice to the Bank Group in defending against the additional counts because they were put on notice by the original pleading of the conduct about which the Trustee complains. Accordingly, we conclude that the counts for aiding a breach of fiduciary duty and improvident lending are not time-barred.

### b. *Standing*

■ The Bank Group also argues that the Trustee lacks standing to bring an action for aiding and abetting a breach of fiduciary duty because a debtor cannot sue itself for breach of fiduciary duties and, accordingly, should not be able to sue a third party for aiding and abetting a breach of fiduciary duty.

We disagree. Courts have held that a trustee may sue its officers and directors for breach of fiduciary duty. *See, e.g., Wieboldt Stores,* 94 B.R. at 508 (holding that even though corporation may not have standing to sue its own officers and directors for breach of fiduciary duty, trustee who represents unsecured creditors does have such standing). Accordingly, we conclude that the Trustee has standing to bring the claims for breach of fiduciary duty and aiding and abetting that breach.

### c. *Merits of Claim*

The Bank Group also argues that the Trustee's Complaints fail because the Debtor is a limited liability company which has no directors and whose members do not owe a fiduciary duty to creditors. They further contend that the directors of the Debtor's parent do not owe a fiduciary duty to the Debtor's creditors.

However, if the Trustee is successful in collapsing the transactions into one, then the Bank Group might be liable for aiding and abetting the breach of fiduciary duties owed by the Selling Companies' officers

and directors to their creditors. *See, e.g., Aluminum Mills*, 132 B.R. at 892 (denying motion to dismiss claim for aiding and abetting breach of fiduciary duty against lender involved in leveraged buyout). *See also, Wallace ex rel Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del.Ch.1999) (citations omitted) (stating that piercing the corporate veil is permitted when the "corporate structure causes fraud or some other injustice"); *Geyer v. Ingersoll Publ'ns, Co.*, 621 A.2d 784, 793 (Del.Ch.1992) (holding that corporate veil may be pierced when subsidiary is merely an alter ego of the parent).

■ To establish liability for aiding and abetting a breach of fiduciary duty, the plaintiff must prove three elements: "a) that the fiduciary's conduct was wrongful; b) that the defendant had knowledge that the fiduciary's wrongful conduct was occurring; and c) that the defendant's conduct gave substantial assistance or encouragement to the fiduciary's wrongful conduct." *Crowthers McCall*, 129 B.R. at 999. *See also, Aluminum Mills*, 132 B.R. at 892; *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 72 (Del.1995).

■ The Trustee has alleged that Carter and Large committed acts which were intended to defraud the creditors of the Selling Companies (and later of the Debtor) and that the Bank Group was aware of these activities and participated in them by extending loans to the Debtor to facilitate the actions of Carter and Large. This, we conclude, is sufficient to state a claim against the Bank Group for aiding and abetting a breach of fiduciary duty. Therefore, the Motion to Dismiss this count of the Complaints will be denied.

### F. *Unjust Enrichment*

The Trustee alleges that the Defendants intentionally depleted the assets of the Debtor through the series of fraudulent transfers to the detriment of the Debtor and the enrichment of themselves.

The Moving Defendants argue that section 546(e) of the Bankruptcy Code preempts this claim of unjust enrichment, therefore mandating dismissal of the claim. In support, the Moving Defendants rely on Judge McKelvie's decision in *Hechinger*, which held that payments made to shareholders in a leveraged buyout were "settlement payment[s]" and thus not avoidable by the trustee as a result of section 546(e) of the Bankruptcy Code. 274 B.R. at 94–97.

The Trustee argues that the instant case is factually distinguishable from *Hechinger*. We concur with the Trustee.

Section 546(e), in relevant part, reads:

[T]he trustee may not avoid a transfer that is a margin payment, . . . or settlement payment . . . made by or to a commodity broker, forward contract merchant, stockbroker, financial institution or securities clearing agency, that is made before the commencement of the case. . . .

11 U.S.C. § 546(e).

■ Section 546(e) was enacted to protect the settlement and clearing systems for stock purchases and sales. *See, e.g., Resorts Int'l, Inc.*, 181 F.3d 505, 514–16 (3d Cir.1999); *In re Kaiser Steel Corp.*, 952 F.2d 1230, 1240–41 (10th Cir.1991); *Hechinger*, 274 B.R. at 94–97.

■ That section does not govern transactions such as those in this case. The payments at issue in this case were not made by or to a "commodity broker, forward contract merchant, stockbroker, financial institution or securities clearing agency." 11 U.S.C. § 546(e). Instead, they were made to the Selling Companies which subsequently gave them to their shareholders. The payments were not

even related to the purchase or sale of stock; rather, the sale at issue was an asset sale. Consequently, the instant case does not implicate the settlement and clearing systems for stock sales in any way. Accordingly, we conclude that section 546(e) is not applicable to the facts as alleged by the Trustee.

The Moving Defendants also assert that the facts alleged by the Trustee do not support a claim for unjust enrichment in any event. Again, we disagree.

■ To support a claim for unjust enrichment, the plaintiff must establish that the defendant received a benefit, that the defendant was aware of the benefit, and that the benefit was accepted by the defendant under circumstances that would make the acceptance inequitable without payment for its value. *See, e.g., Jackson Nat'l Life Ins. Co., v. Kennedy,* 741 A.2d 377, 393 (Del.Ch.1999) (holding that unjust enrichment is the retention of a benefit to the loss of another under circumstances that would go against fundamental principles of justice, equity or good conscience).

■ In this case, the Trustee alleges facts which support all the elements needed. Accordingly, as to this count, the Moving Defendants' Motions to Dismiss and for a More Definitive Statement will be denied.

### G. *Equitable Subordination*

In his Complaint against the Bank Group, the Trustee asserts that their secured claims should be subordinated pursuant to section 510(c) because they (1) knowingly facilitated the removal of at least $40 million in assets of the Debtor (by obtaining a security interest in them) at a time when the Debtor was insolvent, (2) that they knowingly and recklessly disregarded the Debtor's insolvency, (3) that they knowingly and recklessly intended to

hinder, delay or defraud the Debtor's creditors, (4) that they knowingly or recklessly disregarded the fact that the LBO would force the Debtor into bankruptcy, and (5) that they knowingly and recklessly disregarded the impact of these transactions on the Debtor's unsecured creditors. The Bank Group contends that the Trustee has failed to plead facts in the complaint that would be tantamount to the requisite "egregious misconduct" that would warrant the employment of equitable subordination pursuant to section 510(c).

Section 510(c) of the Bankruptcy Code provides:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c).

■ Since section 510(c) incorporates the general principles of equitable subordination, courts generally apply the three-prong test established by the Fifth Circuit:

(i) The claimant must have engaged in some type of inequitable conduct.

(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*In re Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir.1977) (citations omitted). *See also, Waslow v. MNC Commercial Corp.*

*(In re M. Paolella & Sons, Inc.)*, 161 B.R. 107, 117 (E.D.Pa.1993); *Century Glove, Inc. v. Iselin (In re Century Glove, Inc.)*, 151 B.R. 327, 333 (Bankr.D.Del.1993); *Aluminum Mills*, 132 B.R. at 893.

■ Equitable subordination is remedial and is used to cure an inequity in a claim against the bankruptcy estate that would produce unfair results. *See, e.g., Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228, 234 (3d Cir.2003) (finding additional subordination of claim warranted by insider's misconduct); *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 988–90 (3d Cir.1998) (holding that insider's claim should be subordinated as a result of its breach of fiduciary duty).

■ For non-insider creditors, the plaintiff must allege "a more egregious level of misconduct" to satisfy the first prong of the *Mobile Steel* test and subordinate the creditor's claim. *Century Glove*, 151 B.R. at 333; *Aluminum Mills*, 132 B.R. at 896. Courts have found that fraud, spoilation or over-reaching are examples of egregious misconduct on the part of a non-insider which would justify the subordination of that creditor's claim under section 510(c). *See, e.g., Paolella*, 161 B.R. at 118 (citations omitted); *Aluminum Mills*, 132 B.R. at 896.

■ The Bank Group argues that the Trustee has failed to plead facts which support a finding of the necessary egregious misconduct. As noted above, we have already concluded that the Trustee has alleged sufficient facts to support claims against the Bank Group for actual and constructive fraud and aiding and abetting breach of fiduciary duty. If proven, these allegations would provide the basis for a finding of egregious misconduct which could warrant the subordination of the Bank Group's claims under section

510(c). *See, e.g., Aluminum Mills*, 132 B.R. at 896 (holding that equitable subordination claim is stated where plaintiff has alleged lender was a party to a fraudulent act that injured other creditors).

## H. *Improvident Lending*

■ In his Complaint against the Bank Group, the Trustee also alleges that, based on their knowledge of the inadequacy of consideration received by the Debtor, the Bank Group improvidently lent funds to the Debtor. The Trustee asserts that this gives rise to a claim against the Bank Group. *See, e.g., Peck v. Chase Manhattan Bank, N.A.*, 190 A.D.2d 547, 593 N.Y.S.2d 509 (N.Y.App.Div.1993) (denying motion to dismiss count for commercial bad faith based on allegations that bank had actual knowledge of and complicity in fraud).

In addition to their contention that this cause of action is time-barred, the Bank Group argues that no such cause of action exists. They cite several cases which they contend support their assertion. *See, e.g., Ramsdell v. Bowles*, 64 F.3d 5 (1st Cir. 1995); *In re Fordham*, 130 B.R. 632, 646 (Bankr.D.Mass.1991); *Hill v. Equitable Bank, N.A.*, 655 F.Supp. 631, 646 (D.Del. 1987); *Ulrich v. Fed. Land Bank of St. Paul*, 192 Mich.App. 194, 480 N.W.2d 910, 912–13 (1991); *Commercial Nat'l Bank in Shreveport v. Audubon Meadow P'ship*, 566 So.2d 1136 (La.Ct.App.1990).

However, upon closer review of those cases, it appears that several actually support the Trustee's contention. For example, in *Hill*, the Court recognized that a lending bank has a duty of reasonable care in processing loan applications of a potential borrower. *Hill*, 655 F.Supp. at 650. In that case, the Court found that the bank had breached that duty when it advised the plaintiff an investment was sound with-

out revealing all relevant facts. *Id.* at 646, 651.

Similarly, the *Ramsdell* Court held that allegations of "the Bank's representations that the . . . contract would generate sufficient cash to repay the . . . loan . . . . [and] a failure by the Bank to prepare cash projections, a business plan, and loan analysis in a professional manner . . . . might withstand a motion to dismiss." 64 F.3d at 10–11. However, because the Court in that case was considering a motion for summary judgment and the plaintiff had failed to present any evidence to support her allegations, judgment was entered in favor of the Bank. *Id.*

We conclude, therefore, that the Trustee has stated a claim against the Bank Group for breach of a duty of care in lending. Accordingly, we will not dismiss this count of the Trustee's Complaint against the Bank Group.

## IV. *CONCLUSION*

For the reasons set forth above, the Motions to Dismiss or for a More Definite Statement will be denied.

An appropriate order is attached.

## ORDER

**AND NOW**, this **2d** day of **MARCH, 2005,** upon consideration of the Motions to Dismiss (or for a More Definitive Statement) filed by the Moving Defendants and the Response thereto by the Trustee, and for the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the Motions are **DE-NIED.**