In re ALPER HOLDINGS
USA, INC., Debtor.

Ray and Cathy Flake, Appellants,

v.

Alper Holdings USA, Inc., Appellee.

Harry Holt, et al., Appellants,

v.

Alper Holdings USA, Inc., Appellee.

Armstrong, Appellants,

v.

Alper Holdings USA, Inc., Appellee.

The Adkins Claimants, Appellants,

v.

Alper Holdings USA, Inc., Appellee.

Nos. 07–12148 (BRL), 08–CV–02489 (CM), 08–CV–3344 (CM), 08–CV–3625 (CM), 08–CV–4355 (CM).

United States District Court,
S.D. New York.

Dec. 15, 2008.

Andrew M. Leblanc, Milbank, Tweed, Hadley & McCloy, LLP, Washington, DC, Jessica Louise Fink, Milbank, Tweed, Hadley & McCloy, LLP, Los Angeles, CA, for Alper Holdings USA, Inc.

Douglas T. Tabachnik, Douglas T. Tabachnik, P.C., Freehold, NJ, for Ray and Cathy Flake, Jon and Charlotte Armstrong, Adkins Claimants, and Personal Injury Plaintiffs.

Alyssa Englund, Orrick, Lorraine S. McGowan, Herrington & Sutcliffe LLP, New York, NY, Debo Patrick Adegbile, Matthew Colangelo, NAACP Legal Defense & Educational Fund, Inc., New York, NY, for Harry Holt.

## DECISION AND ORDER AFFIRMING THE BANKRUPTCY COURT'S DECISION GRANTING THE OBJECTION OF ALPER HOLDINGS USA, INC., TO PROOFS OF CLAIM FILED BY FLAKE, ARMSTRONG, ADKINS AND HOLT CLAIMANTS

McMAHON, District Judge.

This is a consolidated bankruptcy appeal. All cases involve a common defendant: debtor Alper Holdings USA, Inc. ("Alper" or "appellee"). In each of these cases, the bankruptcy court (Lifland, B.J.) dismissed, pursuant to 11 U.S.C. § 502(a), a proof of claim filed against Alper relating to the alleged contamination and remediation of an industrial site owned by Saltire Industrial, Inc. ("Saltire") and located in Dickson County, Tennessee. Each of the Appellants seeks to hold Alper liable for damages arising out of the remediation; Judge Lifland ruled that Alper could not be held liable.

For the reasons stated below, the bankruptcy court's orders are affirmed.

### BACKGROUND

*Relevant History of Alper and Saltire*

These claims arise in connection with groundwater contamination and environmental problems that first came to light in the mid–1980's in Dickson County, Tennessee. The contamination was allegedly caused, in part, by Saltire. From approximately 1964 until March 1985, Saltire operated a plant in Dickson County (the "Dickson Plant"), where it made automotive tire valves and associated products, and where Trichloroethyleme ("TCE"), a carcinogenic agent, was used as a degreaser. The Dickson Plant ceased operations in March 1985. (*See e.g.*, Armstrong Proof of Claim, Ex. A at 1) From 1985 through August 2004, Saltire performed an investi-

gation and remediation of environmental contamination at the Dickson Plant site. *In re Alper Holdings USA, Inc.*, 07–12148, 2008 WL 160203 at *1 (Bankr.S.D.N.Y. Jan. 15, 2008).

In 1992—seven years after the Dickson Plant ceased operations—Alper became the indirect parent company of Saltire. Armstrong Proof of Claim, Ex. A at ·2. Alper ultimately became the direct parent of Saltire, but that did not occur until 1994. *Id.; Alper*, 2008 WL 160203 at *1. Appellants do not allege that Alper had any relationship with Saltire during the period the Dickson Plant was manufacturing tire valves, while Saltire was allegedly disposing of TCE-laden industrial waste in Dickson County. (*See, e.g.*, Armstrong Proof of Claim, Ex. A.)

Alper and Saltire entered into a management agreement, dated as of November 30, 1992. On January 1, 1995, Alper and Saltire terminated their 1992 agreement and entered into a new management agreement. (Bank. Dkt. # 147, Armstrong Resp. to Alper Obj. Ex. C. (hereinafter, the "New Management Agreement").) Under the New Management Agreement, Alper agreed to provide Saltire with, *inter alia*, "supervision and management of various environmental matters, including risk assessment, technical assessment, remediation, legal and compliance." (New Management Agreement ¶ 1(g).) The New Management Agreement contained mutual indemnification clauses whereby Saltire and Alper agreed to hold each other harmless for "any and all loss, damage, claim or liability ... of any nature...." *Id.* ¶ 7.

Soon after the execution of the New Management Agreement, the remediation efforts at the Dickson Plant were taken over by Nicholas Bauer ("Bauer"). (*See, e.g.*, Armstrong Proof of Claim, Ex. A at 3.) Bauer served as Saltire's Vice President of Environmental Affairs, and his job was to take care of the Saltire remediation. However, Bauer was paid by Alper and when engaging in work relevant to environmental investigation and remediation Bauer sometimes represented himself as an Alper official. Armstrong Proof of Claim, Ex. A at 3. Bauer worked out of an office in Virginia where Alper, and not Saltire, was authorized to do business. *Id.* at 4. He was, in effect, loaned to Saltire by Alper for the purpose of supervising the remediation efforts at the Dickson Plant.

Since 2003, numerous parties have filed lawsuits in Tennessee for alleged personal injury and property damage claims related to the environmental contamination in Dickson, Tennessee (collectively, the "Tennessee Actions"). The Tennessee Actions include three actions known as the "Dickson Actions": (1) *Flake v. Saltire Indus., Inc. f/k/a/ Scovill, Inc.; Schrader–Bridgeport Int'l, Inc. f//k/a Schrader Auto., Inc.; Alper Holdings USA, Inc.; Tomkins PLC; the City; William Andrews; Lewis Edward Kilmarx and John Doe(s) 1–10* (the "Flake Tennessee Action"); (2) *Armstrong v. Saltire Indus., Inc. f/k/a Scovill, Inc.; Schrader–Bridgeport Int'l, Inc. f/k/a Schrader Auto., Inc.; Alper Holdings USA, Inc.; Tomkins PLC; ArvinMeritor, Inc.; William Andrews; Lewis Edward Kilmarx and John Doe(s) 1–10* (the "Armstrong Tennessee Action"); and (3) *Adkins v. Schrader–Bridgeport Int'l, Inc.; Alper Holdings USA, Inc.; ArvinMeritor, Inc.; the City; the County; William Andrews; Lewis Kilmarx and John Does* (the "Adkins Tennessee Action"). These three actions (collectively the "Dickson Actions") underlie the Flake, Armstrong and Adkins claims that are here in issue.

The other Tennessee Actions are; (1) *Harry Holt, et al. v. Scovill, Inc., n/k/a Saltire Indus., Inc.; Alper Holdings USA, Inc.; Ebbtide Corp. and the City and County of Dickson, Tennessee* (the "Holt

Tennessee Action"); (2) *Lavenia Holt, et al., v. Scovill, Inc. et al.* (the "Lavenia Holt Action"); and (3) *Dunbar v. Saltire Indus., f/k/a Scovill, Inc. et al.*, pending in the Circuit Court of Dickson County, Tennessee (the "Dunbar Action"). A subset of claims at issue in the Holt Tennessee Action underlie the Holt claims issues here.

### Saltire's Bankruptcy

On August 17, 2004, in part to deal with liabilities related to the Dickson Plant, Saltire filed a voluntary petition for relief in the Southern District under Chapter 11 of the Bankruptcy Code. *In re Saltire Indus., Inc.*, Case No. 04–15389(BRL) (Bankr. S.D.N.Y.2004). Judge Lifland presided over that bankruptcy proceeding.

On March 8, 2006, an order was entered in Saltire's bankruptcy case confirming Saltire's Modified First Amended Chapter 11 Plan of Liquidation (Saltire's "Reorganization Plan"). As part of the Reorganization Plan, Alper negotiated with the Saltire Creditors Committee, acting on behalf of Saltire, a settlement of the claims between Alper and Saltire. In return for a release from Saltire, Alper agreed to forego its claims against Saltire and to pay $1 million to Saltire. The Saltire release of claims provides in pertinent part:

> The Debtor ... acquits and forever discharges Alper ... from any and all actions, causes of action [and] liabilities ... in any way relating to the Debtor ... that the Debtor could assert directly or any Holder of a Claim ... could assert derivatively or on behalf of the Debtor or its estate ... Notwithstanding the foregoing, the above release does not release any claims any nondebtor third party may hold against any of the Released Parties, *except to the extent any nondebtor third party is asserting a claim that is property of the Debtor's Estate.* (emphasis added.)

The bankruptcy court approved the Saltire–Alper Settlement (the "Release") on March 8, 2006. (Alper Opp'n. to Holt Br.) The Reorganization Plan became effective on April 25, 2006.

### Alper's Bankruptcy

On July 13, 2007, Alper filed for relief under Chapter 11 of the Bankruptcy Code. Alper continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Judge Lifland, who has extensive experience with the background of the Saltire situation, is also presiding over the Alper bankruptcy case.

## CLAIMS AT ISSUE IN THIS APPEAL

### The Flake, Armstrong and Adkins Claims

The Flakes own land in Dickson, Tennessee. There is a spring on their property, and the Flakes wanted to bottle water from the spring and offer it for sale. Their plans were upended when they learned that the wells on their property were contaminated with TCE. They sued Alper in the Circuit Court of Dickson County in Tennessee. That lawsuit was stayed when Alper filed for bankruptcy.

The Armstrongs also own property in Dickson. They too sued Alper, alleging that the value of their property was diminished as a direct result of the TCE contamination.

The Adkins claim that they suffered personal injury, including wrongful death, as a result of the TCE contamination. They sued Alper prior to the bankruptcy in Tennessee state court.

The Flakes, Armstrongs and Adkins are all represented by the same lawyers: the law firm of Stutzman, Bromberg, Esserman & Plifka (the "Esserman" firm). All three sets of Claimants filed proofs of

claim in the bankruptcy court, to which they appended their state court pleadings. Various amended proofs of claim were filed as well, and there were a variety of procedural motions filed that are irrelevant to this appeal.

The proofs of claim filed by these three parties generally allege that the claimants were damaged because Alper failed to monitor, control and/or supervise the disposal of TCE in an adequate manner. The Armstrongs and the Adkins specifically alleged (in amended proofs of claim that may or may not have been timely filed) that Alper assumed control of the remediation when it loaned Bauer, its employee, to handle the remediation. They also alleged that Alper conducted that remediation in a negligent manner, specifically contending that Alper breached a duty owed to them by (1) failing to appreciate the geological makeup of Dickson County, (2) failing to come up with a comprehensive remediation plan, and (3) failing to use proper remediation equipment or to conduct appropriate tests and samples of areas that might have been contaminated. These allegations make up the Claimants theory that Alper is directly liable for their injuries, even though it had no connection to Saltire while the polluting activity was taking place.

The Flakes, Armstrongs and Adkins also assert an indirect or "alter ego" theory of liability. The Armstrongs and the Adkins allege, in a conclusory fashion, that, as of 1992, Saltire "had become a partial shell," and point to the fact that Saltire had no employees in 2001 to support their position that Alper, as Saltire's alter ego, was running the remediation. (*See, e.g.,* Armstrong Proof of Claim, Ex. A at 2.) To support their indirect theory of liability, the Flakes, Armstrongs and Adkins again rely on the existence of the New Management Agreement and Bauer's

dual employment—the same evidence on which they base their direct theory of liability.

Alper filed substantive and procedural objections to all the proofs of claim and amended proofs of claim.

Judge Lifland disallowed the Flakes' proof of claim in a decision dated January 15, 2008. He ruled that Alper could not be directly liable for causing the contamination because Alper had no connection or relationship to Saltire or Dickson County until seven years after the Dickson Plant closed in 1985. *Alper,* 2008 WL 160203 at **4–5. Noting that Saltire, not Alper, operated the Dickson Plant during the period when the contamination occurred, *id.,* he concluded that Alper's obtaining what he described as an "indirect, incidental" ownership interest in Saltire, in connection with the bankruptcy of Saltire's former parent, First City Industries, Inc. ("First City"), did not retroactively make Alper liable for what went on in the Dickson Plant prior to its closure. *Id.* at *4. He concluded that the Flakes had failed to plead any specific facts tending to show that Alper was or ought to be liable for the effects of the contamination. Judge Lifland rejected, as a matter of law, the Flakes' contention that Alper had assumed control of the remediation by loaning Bauer, its employee, to Saltire to direct remediation efforts. He ruled that neither the existence of the New Management Agreement nor the fact that a common employee oversaw the remediation would justify the extraordinary remedy of piercing the corporate veil between Saltire and Alper. *Id.* at **5–6.

In a separate opinion dated February 25, 2008, Judge Lifland disallowed the Armstrongs' proof of claim. Relying on the *Flake* opinion, Judge Lifland held that the Armstrong plaintiffs had failed to allege any facts, in either their original or

their amended proofs of claim, that rendered Alper liable for damage caused by the TCE contamination at the Dickson Plant. *In re Alper Holdings USA, Inc.*, 07–12148, 2008 WL 541154 (Bankr. S.D.N.Y. Feb. 25, 2008). Once again, Judge Lifland ruled that the Armstrongs' allegation that a common employee supervised the remediation work, without more, failed to overcome the legal presumption that Bauer was acting in his capacity as an officer of Saltire, and on behalf of Saltire, when performing remediation work. Judge Lifland found no allegation in the proof of claim tending to show that Alper otherwise participated in the remediation. *Id.* at *3. Judge Lifland also ruled that the Armstrongs, like the Flakes, had failed to allege any facts that would justify imposing liability on the part of Alper in light of the fact that Alper's ownership interest in Saltire was "incidental", the result of a debt to equity swap in First City's thenpending Chapter 11 bankruptcy. *Id.* at *4.

Finally, Judge Lifland disallowed the Adkins' proof of claim on April 13, 2008. *In re Alper Holdings USA, Inc.*, 386 B.R. 441 (Bankr.S.D.N.Y.2008). The Adkins Claimants (but not the Flakes or the Armstrongs) asserted that Judge Lifland had no jurisdiction to disallow their personal injury claims. They had previously filed a motion to withdraw the reference in this court, and they tried without success to obtain a stay of proceedings in the bankruptcy court so that motion could be adjudicated. Judge Lifland rejected the application for a stay and the challenge to the bankruptcy court jurisdiction. He concluded that he had jurisdiction to decide whether a proof of claim stated a claim as a matter of law—a matter that courts in this circuit have repeatedly held to fall within the bankruptcy court's "core" jurisdiction—and rejected the argument that he was actually engaged in the non-core function of liquidating or estimating the

Adkins' personal injury claims, as the Adkins contended. *Id.* at 451.

On the merits, Judge Lifland noted that the Adkins' argument for imposition of direct liability against Alper was no different than the one he had rejected in the Flake and Armstrong opinions, and that the Adkins' complaint was devoid of any non-conclusory allegations tending to show that Alper negligently remediated the site or assumed a duty of care to the claimants. *Id.* at 449. Judge Lifland further ruled that the Adkins' alter ego (indirect liability) claim had been discharged in the Saltire bankruptcy because it was a general claim that could have been brought by Saltire or by any Saltire creditor in connection with Saltire's reorganization. *Id.* at 450. This aspect of the bankruptcy judge's opinion will be discussed more fully below, in connection with my discussion of the Holt Claimants' proof of claim.

To summarize: in all three cases brought by the Esserman firm, Judge Lifland disallowed the claims because, *inter alia*, the allegations in the proofs of claim, and in the attachments thereto, were insufficient, as a matter of law, to warrant imposing either direct or indirect liability on Alper for damages inflicted as a result of the Saltire clean-up. In *Adkins*, Judge Lifland also ruled that any indirect liability (alter ego) claims had been released by Saltire in its bankruptcy proceeding.

All three parties timely appealed to this court.

### Holt Claims

The Holts, homeowners whose family has owned the same property in Dickson County for over a century, were involuntarily exposed to carcinogenic industrial pollutants by using the water that came into their home from a nearby well. As a result of this exposure, they have alleged

that they suffered, and continue to suffer, serious physical harm, and even death.

The Holt Claims are based upon a separate complaint filed in Tennessee on or about December 3, 2003 (the "Holt Tennessee Complaint"). Unlike the Flake, Armstrong and Adkins Claimants, the Holt Claimants did not allege that their injuries were caused, in whole or in part, by the remediation efforts, or that Alper had assumed some duty to them by overseeing the remediation. Instead, the Holt Claimants admit that their injury was caused entirely by the original contamination in Dickson County, which took place before Alper had anything to do with Saltire, Accordingly, the Holt Claimants' allegations as they pertained to Alper are based entirely on a theory of alter ego liability.

The Holts asserted that Alper could be held liable for Saltire's contamination of the site because it was the alter ego of Saltire. But unlike the Flakes, Armstrongs and Adkins, the Holts did not rely on Bauer's dual employee status and the New Management Agreement to support their theory. Instead, the Holt Claimants allege that: (1) Alper was not merely an indirect or incidental parent of Saltire, as had been previously contended, but rather was formed for the sole purpose of acquiring First City during its then pending Chapter 11 proceeding; (2) Alper dominated and controlled the management and direction of Saltire to a much greater extent than had previously been suggested; and (3) Alper (and First City before it) diverted assets away from Saltire, which left Saltire grossly undercapitalized and eventuated in Saltire's filing for bankruptcy protection under Chapter 11 of the Bankruptcy Code in August 2004. (See Holt Tennessee Compl.) In essence, the Holts asserted that Alper had looted Saltire, and so rendered it judgment proof. These claims were not made in conclusory fashion, but were supported with specific, factual allegations.

Alper objected to the Holt Claimants' claims. It urged that any alter ego claims the Holts' may have had against Alper were property of Saltire's bankruptcy estate, and so had been released under the Saltire Reorganization Plan. Even if such claims had not been released pursuant to the Saltire Reorganization Plan, Alper argued that they could not be asserted against Alper because Saltire had been a publicly traded company during the entire time that it operated the Dickson Plant— the period when the contamination that allegedly caused the injuries took place— and Alper did not exercise any dominion or control over Saltire's operations, as required to support such claims. (Alper Obj. to Holt Pls.' Proof of Claim).

■ In response, the Holt Claimants contended that their alter ego claims against Alper were not property of Saltire Bankruptcy estate, but were instead non-debtor third party claims that Saltire was unable to release under the Saltire plan. The Holt Claimants argued that Tennessee law governed analysis of alter ego claims (even though all the corporations involved were Delaware corporations). Under Tennessee law, a debtor subsidiary does not have the ability to pierce its own corporate veil, so if Tennessee law applied, the alter ego "looting" claims could not have been resolved by Saltire's bankruptcy. The Holts also argued that their alter ego claims could not have been discharged because they were personal to the Holts and could not have been brought by any creditor of Alper. (Holt Resp. to Alper Obj.)

On February 25, 2008, Judge Lifland disallowed and expunged the Holt claims, in the same opinion in which he expunged the Armstrong claims. *Alper,* 2008 WL 541154 at *6. The bankruptcy court held that the Holts' alter ego claims were of a

generalized nature and did not allege a "particularized injury" specific only to the Holt Claimants. *Id.* Accordingly the bankruptcy court, applying Delaware (not Tennessee) law, held that such alter ego claims were property of Saltire's bankruptcy estate and had been released under section 13.1 of the Saltire Reorganization Plan. *Id.*

## QUESTIONS PRESENTED ON APPEAL

Distilled to their essence, the various opinions of the bankruptcy court hold two things: first, Alper cannot be held liable to the Flake, Armstrong and Adkins Claimants on a theory that it negligently undertook the remediation efforts in Dickson County; and second, Alper cannot be held liable to any of the Claimants on a theory that it is the "alter ego" of Saltire, the entity that caused the environmental contamination in the first place. The following questions are presented on appeal:

### A. Did The Bankruptcy Court Have Jurisdiction To Apply Dispositive Legal Defenses And Disallow The Personal Injury Claims Filed By The Adkins Claimants?

As an initial matter this Court must determine whether the bankruptcy court had jurisdiction to disallow the personal injury claims of the Adkins Claimants. The Adkins argue the adjudication of their personal injury claims was in error because personal injury claims are outside the core jurisdiction of a bankruptcy court under 28 U.S.C. §§ 157(b)(2) and 157(b)(5). (Armstrong and Adkins Joint Supp'l. Br. at 18.)

Alper argues that the bankruptcy court's dismissal as a matter of law of the Adkins' personal injury claims was an appropriate exercise of its jurisdiction to make threshold determinations as to whether, as a matter of law, a claim exists and can be asserted against the debtor. (Alper Opp'n. to Joint Supp'l. Br. at 15–16.)

### B. Did The Bankruptcy Court Apply The Proper Standard To Alper's Objections To The Claimants' Proofs of Claim?

The Flake Claimants argue in their brief on appeal that the bankruptcy court improperly considered evidence outside of the facts of the Flake proofs of claim and erroneously required the Flakes to prove their claims by a preponderance of evidence standard instead of treating Alper's objection to the proof of claims as a motion to dismiss for failure to state a claim. (*See* Flake Br. at 11–12.) In the alternative, the Flakes argue that, to the extent that the claim objection was converted to a motion for summary judgment, the relief granted was improper in the absence of discovery. (*Id.* at 16.)

Alper responds that the bankruptcy court properly considered and dismissed the Claimants's claims under a 12(b)(6) standard, ruling that the facts plead in the proofs of claim and the attached papers concerning the existence of a management agreement and a common employee were insufficient to demonstrate either direct or indirect liability on the part of Alper. (Alper Opp'n to Flake Br. at 12)

### C. Is Alper Directly Liable To The Flake, Adkins And Armstrong Claimants?

#### 1. *Is Alper Directly Liable Based on the Dual Employee Nicholas Bauer and the Existence of a Management Agreement?*

The Flakes, Armstrongs and Adkins assert that the bankruptcy court could not have concluded as a matter of law that Alper did not oversee and participate in

the remediation of the Dickson plant, pointing to the Claimants' allegations concerning the New Management Agreement between Alper and Saltire and activities of the common employee Bauer in the remediation efforts. (*See* Flake, Armstrong and Adkins Joint Reply Br. at 9.)

2. *Did Alper Assume a Duty of Care to the Claimants, Which it Breached by Performing the Remediation in a Negligent Manner?*

The Flakes, Armstrongs and Adkins argue Judge Lifland erred when he found that Alper was not liable on a theory that Alper assumed a duty to the Claimants by taking over the remediation, which it then breached by performing the remediation in a negligent manner.

In support of their allegations the three sets of Claimants re-allege the facts put forth in their amended proof of claim concerning the inadequacies in Alper's handling of the remediation. (*See, e.g.,* Flake, Armstrong and Adkins Joint Reply Br. at 19.)

3. *Is Alper Liable for Failing to Warn the Claimants of the Dangers Posed by the TCE Contamination in Dickson County?*

Additionally, the Flake, Armstrongs and Adkins Claimants argue that the bankruptcy court should not have disallowed their claims, arguing that their injuries were caused, at least in part, by the failure of Alper to warn the Claimants and the public about the existence of TCE in Dickson County. (*Id.*)

**D. Can Alper Be Held Indirectly Liable For The Contamination Based On A Veil Piercing Theory?**

1. *Does Delaware or Tennessee Law apply to the veil piercing analysis?*

Claimants urge the Court to apply the law of Tennessee because of the significant contacts the litigants have had with that state and the fact that Tennessee, as the polluted state has the greatest interest in the litigation. (*See, e.g.,* Holt Br. at 9–10.) Alper counters that Delaware law controls the analysis, as Delaware is the state of Alper's incorporation and that factor carries most weight under New York's admittedly applicable choice of law principles. (*See, e.g.,* Alper Opp'n to Holt Br. at 8.)

2. *Were all of Claimants' alter ego claims released by the Saltire Reorganization Plan as property of the Saltire estate?*

All four of the Claimants argue that it was an error for the bankruptcy court to conclude that their alter ego claims were released by the Saltire plan. Alper argues that all of the Claimants present general corporate veil piercing issues that were properly settled by the Saltire trustee under applicable law.

**E. Did The Bankruptcy Court Properly Exercise Its Discretion In Denying The Flake Claimants' Requests For (1) Discovery Before The Hearing On Alper's Motion To Dismiss The Flake Claimants' Claims Or (2) An Additional Opportunity To Amend Their Proof Of Claim?**

### DISCUSSION

**I. Standard of Review**

The district court reviews the bankruptcy court's findings of facts for clear error. *In re Premier Operations,* 294 B.R. 213, 217 (S.D.N.Y.2003). By contrast, a *de novo* standard of review applies to questions of law. *In re Premier Operations,* 294 B.R. at 217 (*citing In re Aro-Chem Corp.,* 176 F.3d 610, 620 (2d Cir. 1999)).

■ The parties agree that dismissing of a proof of claim pursuant to 11 U.S.C. § 502(c) is equivalent to dismissing a claim under Fed.R.Civ.P. 12(b)(6), for failure to state a claim, and that the court is bound by the same set of standards in reviewing such a motion. Because an appeal from the decision on a motion to dismiss for failure to state a claim involves purely legal considerations, this Court's review of that decision must be *de novo*. *See Raine v. Lorimar Prods., Inc.*, 71 B.R. 450, 452 (S.D.N.Y.1987).

The standard of review on a motion to dismiss is heavily weighted in favor of the plaintiff. "In ruling on a motion to dismiss for failure to state a claim upon which relief may be granted, the court is required to accept the material facts alleged in the complaint as true." *Frasier v. Gen. Elec. Co.*, 930 F.2d 1004, 1007 (2d Cir. 1991). The court is also required to read a complaint generously, drawing all reasonable inferences from its allegations in favor of the plaintiff. *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 515, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (internal quotation marks, citations, and alterations omitted). Indeed, a plaintiff must assert "enough facts to state a claim to relief·that is plausible on its face." *Id.* at 1974. This "plausibility standard" is a flexible one, "oblig[ing] a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" *Iqbal v. Hasty*, 490 F.3d 143, 157–58 (2d Cir.2007), *cert granted*, —

U.S. ——, 128 S.Ct. 2931, 171 L.Ed.2d 863 (2008).

■ In deciding a motion to dismiss, this court may consider the full text of documents that are quoted in the complaint or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit. *Rothman v. Gregor*, 220 F.3d 81, 88–89 (2d Cir.2000); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 808 (2d Cir.1996). In this case the proofs of claim were accompanied by either (i) a state court complaint, in the case of the Flake Claimants; (ii) a brief statement of background and the Claimants' theory of recovery, in the case of the Armstrong and Adkins Claimants; or (iii) both, in the case of the Holt Claimants. The documents attached to the proofs of claim should be treated, for purposes of a motion to disallow claims, like documents that are attached to or relied upon in a complaint are treated on a Rule 12(b)(6) motion to dismiss—that is, the court will consider "documents attached to the complaint as exhibits and documents incorporated by reference in the complaint." *Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir.1999).

■ A bankruptcy court's decision not to permit amendment of a proof of claim, by contrast, is reversible for abuse of discretion. *See Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.)*, 419 F.3d 115, 125 (2d Cir. 2005). In addition, a "trial court enjoys wide discretion in its handling of pre-trial discovery, and its rulings with regard to discovery are reversed only upon a clear showing of an abuse of discretion." *In re DG Acquisition Corp.*, 151 F.3d 75, 79 (2d Cir.1998) (internal quotation marks omitted). Under the abuse of discretion standard, the appellate court should not dis-

turb a bankruptcy court's decision unless "(1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decision." *Zervos v. Verizon N.Y., Inc.,* 252 F.3d 163, 169 (2d Cir.2001).

## II. The Bankruptcy Court Properly Assumed Jurisdiction Over The Adkins Personal Injury Claims.

Contrary to the Adkins Claimants' contention, it is well settled that a bankruptcy court has "the authority . . . to apply . . . dispositive legal defenses in the disallowance of claims, including personal injury claims." *U.S. Lines, Inc. v. U.S. Lines Reorganization Trust,* 262 B.R. 223, 234 (S.D.N.Y.2001); *In re Chateaugay Corp.,* 111 B.R. 67, 76 (Bankr.S.D.N.Y. 1990); *In re Dow Corning Corp.,* 215 B.R. 346, 360 (Bankr.E.D.Mich.1997).

The Adkins Claimants miss a key distinction between bankruptcy proceedings involving the "allowance or disallowance of claims, including personal injury and wrongful death claims, versus the liquidation or estimation thereof for the purpose of distributions." *Chateaugay Corp.,* 111 B.R. at 76. 28 U.S.C. § 157(b)(2)(B) expressly provides that allowance or disallowance of claims is a core proceeding (over which the bankruptcy court has jurisdiction), but excludes the "liquidation or estimation of contingent or unliquidated personal injury . . . claims." The bankruptcy court clearly had jurisdiction to disallow the personal injury claim.

In addition, although 28 U.S.C. § 157(b)(5) provides that personal injury claims shall be tried in the district court in which the bankruptcy case is pending, a bankruptcy court still has jurisdiction to determine whether any right to trial exists. *See Chateaugay Corp.,* 111 B.R. at 76 ("the bankruptcy court must have jurisdiction to make the threshold determination of whether as a matter of law, a claim exists which can be asserted against the debtor, even if that claim sounds in personal injury.").

All Judge Lifland did was decide whether, as a matter of law, a viable claim had been asserted against the debtor. He did not decide the claim on the merits. He had undoubted jurisdiction to make such a determination. The question on appeal is whether his conclusion that no claims were stated as a matter of law is correct. As discussed *infra,* this conclusion was correct.

## III. The Bankruptcy Court Did Not Improperly Rely On Facts Outside Of The Proofs Of Claim And The Materials Submitted Therewith.

The Flakes argue on appeal that Alper's claim objection contained allegations outside the face of the Flake Proof of Claim that were improperly considered by the bankruptcy court when it reached its decision disallowing and expunging the Flake Proof of Claim. Specifically, the Flakes claim that the Declaration of Jessica Fink (the "Fink Declaration") filed in support of Alper's claim objection contained allegations and evidentiary material not referenced in or included with the Flake Proof of Claim that were then improperly incorporated into Judge Lifland's decision disallowing their claim. (*See* Flake Br. at 14–15.) The Flakes argue the bankruptcy court was in error when it considered materials submitted with the Alper objection, absent a showing that the Flakes themselves relied upon such evidence when submitting their Proof of Claim, on a motion to dismiss. (*Id.* at 14.)

I conclude that Judge Lifland disallowed the Flake claims because of the deficiencies in the Flake Proof of Claim and the attachments thereto. He ruled that the facts alleged by Flakes, assuming them all to be true, simply did not state a claim against Alper. Judge Lifland correctly determined that the Flakes' generic complaint aimed at twenty-one different defendants, rather than specific, tailored allegations against Alper, was insufficient to withstand a motion to dismiss. *Alper*, 2008 WL 160203 at *4. The Flakes' bare bones allegations simply do not make out a plausible claim of liability against Alper for the contamination at the Dickson plant.

The Flakes contend that evidence and allegations submitted by Alper, such as that the Dickson contamination was "widely known" since the mid–1980s, was improperly relied upon by Judge Lifland in rendering his decision. (Flake Br. at 15.) It is an inescapable truth that Judge Lifland, who has handled both the Alper and Saltire bankruptcies, brings his background knowledge of these two companies to bear in this case. While references to extraneous material not contained in a proof of claim or their attachments should have been avoided, it does not appear that the extraneous material formed the basis of Judge Lifland's decision.

In any event, in my review of the bankruptcy court's decision I have ignored any overtly evidentiary material (like the Fink Declaration) and have limited myself to (1) the proofs of claim and the attached documents and (2) Alper's legal arguments.

## IV. Alper Is Not Directly Liable To The Flake, Armstrong Or Adkins Claimants.

To survive a motion to dismiss on their direct cause of action against Alper, the Claimants must plead facts tending to show that Alper owed a duty to the Claimants, that the duty was breached, and that the breach was the cause in fact and proximate cause of the Claimants' injury or loss. *See Ham v. Hosp. of Morristown, Inc.*, 917 F.Supp. 531, 534 (E.D.Tenn. 1995); *Shouse v. Otis*, 224 Tenn. 1, 448 S.W.2d 673, 676 (1969).

In their complaints and proofs of claim, the Flake, Armstrong and Adkins Claimants allege that Alper owed them a duty of care either because it controlled the investigation and remediation at the Dickson Plant (which it conducted negligently) or because it failed to warn plaintiffs of the dangers of the toxic material on their properties. However, Judge Lifland correctly concluded that the Flake, Armstrong and Adkins Claimants failed to plead any specific factual allegations that demonstrate direct liability on the part of Alper.

### A. The Facts Alleged, Even If True, Do Not Give Rise To Direct Liability Against Alper.

The Flake, Adkins and Armstrong Claimants allege that Alper can be held directly liable for damages caused by the negligent remediation of the Dickson contamination because of Alper's direct participation in the clean up. They assert that Alper controlled the remediation because it was overseen by Bauer, who was employed by both companies and whose services were "issued" to Saltire in the New Management Agreement. All three sets of Claimants allege, in substance, that Alper hired Bauer shortly after the execution of the New Management Agreement between Alper and Saltire and that they hired him for the purpose of putting him in charge of Saltire's remediation effort. It appears to be agreed by all parties that, despite Bauer's title as Vice President of Saltire, he was, in the most technical sense, an employee of Alper—that is, he was on

Alper's payroll, he worked out of Alper's offices, and he represented himself as being employed by Alper. (*See;* Armstrong Proof of Claim, Ex, A; Adkins Proof of Claim, Ex. A; Flake Resp. to Alper Obj. at 7.)

The question is whether these allegations, assuming them to be true, are sufficient to withstand a motion to dismiss.

In *United States v. Bestfoods,* 524 U.S. 51, 61–62, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), the United States brought an action for the costs of cleaning up industrial waste generated by a chemical plant. The issue was whether, under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), 94 Stat. 2767, as amended, 42 U.S.C. § 9601 *et seq.,* a parent corporation that exercised active control over the subsidiary could, without more, be held liable as an operator of a polluting facility owned and operated by the subsidiary. The Supreme Court concluded that the answer was no, unless the corporate veil could be pierced. The Court further stated, however, that a corporate parent could be held directly liable for the costs of cleaning up the pollution if "through the conduit of its personnel and management" it actively participated in and exercised control over the operations of the facility itself. 524 U.S. 51 at 55, 118 S.Ct. 1876, 141 L.Ed.2d 43.

The liability analysis under *Bestfoods* should focus on the parent corporation's relationship with the subsidiary's polluting facility—including interactions between employees of the parent corporation and the facility. The fact that a parent shares employees, directors and officers with a subsidiary does not, in and of itself, render the parent liable for acts performed at subsidiary's facility. Indeed, the Court in *Bestfoods* stated that there is a presumption that dual officers are "wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary." *Id.* at 69, 118 S.Ct. 1876. In order to rebut this presumption, the Court reasoned, a plaintiff would need to demonstrate that the parent, through its officer, was acting "to operate" the subsidiary's facility under CERCLA, interpreting Congress to have intended an "exercise of direction over the facility's activities" with the term "operate." *Id.* at 71, 118 S.Ct. 1876.

The *Bestfoods* Court conceived of three potential scenarios in which a parent could be held directly liable for operating a subsidiary facility: (1) when a parent operates a facility in the stead of its subsidiary or alongside the subsidiary in some sort of joint venture; (2) when a dual officer's role "depart[s] so far from the norms of parental influences exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility;" and (3) when "an agent of the parent with no hat to wear but the parent's hat might manage or direct activities at the facility." *Id.* Noting that the norms of corporate behavior are "crucial reference points," *Id.* at 72, 118 S.Ct. 1876, the Court remanded so the lower court could reevaluate whether the activities of one of the parent corporation's employees, who was "directly involved in environmental and regulatory matters" of the subsidiary and who had "actively participated in and exerted control over" the subsidiary facility fell outside the norms of typical parental oversight of its subsidiary. *Id.*

In this case, the bankruptcy court ruled that nothing alleged in the Flake, Armstrong or Adkins proofs of claim, and the various papers attached thereto—even assuming that those allegations to be true—was sufficient to overcome the *Bestfoods* presumption that Bauer, a dual employee,

was acting on behalf of Saltire when working on the remediation. The Flake, Armstrong and Adkins Claimants argue that this determination was not appropriately made on what was, in essence, a motion to dismiss. Alper responds that the *Best-foods* presumption becomes meaningless unless a pleader sets forth some facts that would, if proved, overcome the presumption. All the Flake, Armstrong and Adkins Claimants pleaded was that Bauer, the man in charge of the remediation, wore two corporate hats—one for Alper and one for Saltire. Alper charges there are no allegations of any act taken by Bauer that could be imputed solely to Alper, rather than Saltire, and no fact-based contention that Bauer departed from the "norms of parental influences" when he wore his "Alper hat." (Alper Opp'n to Flake Br. at 17–18.)

All of the facts alleged by the Claimants concerning Bauer—that he was hired by Alper for purposes of the remediation, that he considered himself an employee of Alper, etc.—are presumed true at this stage in the litigation.[1] Claimants contend that liability exists because "for whatever reason, Alper felt it necessary for Mr. Bauer's management of the Dickson remediation to be conducted as an employee of Alper—as opposed to an officer of Saltire." (Armstrong and Adkins Supp'l. Br. at 12.) However, the Claimants pleaded no facts that would rebut the presumption that Bauer was acting on behalf of Saltire when he oversaw the remediation. Claimants admit that Bauer, in addition to being an employee and officer of Alper, was also an officer of Saltire. They do not identify in their pleadings any specific actions undertaken by Bauer that were for the benefit of Alper but not for the benefit of Saltire. *See Bestfoods*, 524 U.S. at 70 n. 13, 118 S.Ct. 1876 ("the presumption that an act is taken on behalf of the corporation for whom the officer claims to act is strongest when the act is perfectly consistent with the norms of corporate behavior, but wanes as the distance from those accepted norms approaches the point of action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent.") Saltire, not Alper, was legally responsible for the clean-up; acts performed by Bauer in furtherance thereof would necessarily benefit Saltire.

Claimants also do not allege any facts tending to show that Bauer's conduct during the remediation "depart[ed] so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility." *Id.* at 71, 118 S.Ct. 1876. The mere fact that Bauer was employed by both companies does not depart from generally accepted practices for plant employees.

Nothing in the New Management Agreement undermines this conclusion. Claimants allege that Alper entered into the New Management Agreement with Saltire on January 1, 1995, pursuant to which Alper agreed to provide Saltire with managerial services in exchange for payment of a fee. (*See, e.g.,* Armstrong Proof of Claim, Ex. A; Adkins Proof of Claim, Ex. A; Flake Resp. to Alper Obj. at 6.) Those services included reviewing business plans, advising on personnel matters, maintaining books and records, supervising legal services, tax planning, and supervising and managing various environmental matters, including "risk assessment, risk management, technical assessment, remediation, legal and compliance." New Management Agreement at 2, ¶ 1(g).

---

1. I have ignored evidentiary declarations explaining why Bauer was on Alper's payroll.

Bauer's services were provided to Saltire by Alper in accordance with the New Management Agreement.

The existence of the New Management Agreement is insufficient to raise the possibility that Bauer was acting on behalf of Alper when he oversaw the Dickson County remediation. In *United States v. Newmont USA Ltd.*, the United States brought an action against several mining companies under CERCLA for clean up of the "Midnite Mine," a former open-pit uranium mine located on an Indian reservation. 05–020, 2007 WL 2405040, at *4 (E.D.Wash. Aug. 17, 2007). Newmont was the parent corporation and majority owner of Dawn Mining Company, LLC (hereinafter "Dawn"), the company that operated the Midnite Mine, and the two companies shared many of the same officers. In 1956, decades before the discovery of the pollutants emanating from the Midnite Mine, Dawn and Newmont entered into a management agreement, pursuant to which Newmont provided Dawn with Newmont employees to act as "resident managers" at Midnite Mine. In addition, the employees of other wholly-owned subsidiaries of Newmont provided "technical" and support services to Dawn pursuant to the management agreement.

The United States sought to hold Newmont liable under CERCLA as a matter of law as an "operator" of the mine. The government, *inter alia*, argued that (1) Newmont managed Dawn's operations at the Midnite Mine through its own employees or those of its wholly owned subsidiaries, and (2) the actions of Newmont personnel at Dawn exceeded the level of involvement consistent with investor status by managing, directing, and conducting the mine's environmental operations.

The court denied the Government's motion for summary judgment. It held, as a matter of law, that Newmont's provision of managerial services pursuant to the management agreement did not make Newmont an "operator" for CERCLA purposes, because of the *Bestfoods* presumption. *Id.* at *12. The court reasoned that, based on the totality of the record, there was no persuasive showing that the resident managers were following Newmont's (rather than Dawn's) direction, and/or that the environmental services provided by employees of Newmont's wholly-owned subsidiaries were consistent with a fee-for-services arrangement. *Id.* at *14.

Similarly, in *Consol. Edison Co. of N.Y., Inc. v. UGI Utils., Inc.*, 310 F.Supp.2d 592 (S.D.N.Y.2004), *aff'd in relevant part*, 153 Fed.Appx. 749 (2d Cir.2005), the court held that a parent corporation was not liable for the CERCLA liability of its subsidiaries. Con Ed sought to hold defendant UGI Utilities, Inc. liable for environmental response costs related to soil and groundwater contamination from manufactured gas plant ("MGP") activities undertaken from 1898 to 1904 at sites owned by a subsidiary and a predecessor of UGI. In March 1900, UGI acquired the New York Suburban Gas Company from the American Gas Company, itself a consolidation of utility companies owned by American Gas. Prior to UGI's purchase of New York Suburban from American Gas in March 1900, American Gas owned the MGP sites in Mount Vernon, New Rochelle, Pelham, Port Chester, and Rye, such that when UGI bought New York Suburban it simultaneously acquired interests in those sites. Con Ed alleged that American Gas incurred CERCLA liability through its control over its Westchester County subsidiaries from 1890 to 1900 and that UGI succeeded to this liability when American Gas merged into UGI in 1925.

The court disagreed and granted the defendant's motion for summary judgment,

holding that, as a matter of law, the following allegations made by the plaintiff (among others) were insufficient to result in liability for the parent corporation: (i) that several parent officers and directors served as managers and directors of the subsidiary, including an officer of the parent who was responsible for the management of the subsidiary's business properties; (ii) that "a known [parent] employee" was involved in the subsidiary's gas operations; (iii) that the subsidiary did not act or make any expenditures without the parent's approval; and (iv) that the parent was appointed as both the purchasing agent and consulting engineer for the subsidiary. *Id.* at 608–09.

Claimants attempt to distinguish these cases by noting that they were all decided in the context of motions for summary judgment—a moment in a litigation when the plaintiff must provide evidence, not simply make allegations. (*See* Flake, Armstrong and Adkins Joint Reply at 15.) While the cases were decided as a matter of law, what was decided was that the facts for which there was proof were insufficient, as a matter of law, to overcome the *Bestfoods* presumption. And the litigants in those cases had taken discovery. Here, by contrast, there has been no discovery.

■ But as Judge Lifland concluded, Claimants' proofs of claim can indeed be disposed of on the equivalent of a pre-answer motion and without discovery. That is because Claimants have failed, in their proofs of claim and the accompanying documents, to allege any facts that, if proved, would allow them to recover. The few facts alleged by Claimants about Alper's relationship to the Saltire remediation—Bauer's dual employment status and the New Management Agreement—are legally insufficient to overcome the *Bestfoods* presumption, even if they are true (and it is undisputed that they are true).

Judge Lifland also did not err when he declined to allow Claimants to pursue discovery prior to ruling on Alper's objections to their proofs of claim. Discovery would serve no purpose, other than as a fishing expedition for evidence in search of a theory that has yet to be asserted.

As Alper notes, the Flake, Armstrong and Adkins Claimants filed multiple amended complaints and proofs of claim in Alper's Bankruptcy, and that they had access to ten years worth of documents and discovery from the *Norman* litigation, which alleged claims against Alper and Saltire based on the same facts asserted by the Flake Claimants. (*See* Alper Opp'n to Flake Br. at 7.) Even with the benefit of that information—the same information that would have been obtained in discovery in these cases—the Claimants nonetheless alleged only that Alper ought to be liable for damage cause by the remediation because Bauer—who wore two corporate hats but considered himself an Alper employee—ran the Saltire remediation. That allegation, without more, simply does not give rise to parental liability for acts undertaken on behalf of a subsidiary under *Bestfoods*.

**B. Alper Is Not Directly Liable To The Claimants For Voluntarily Undertaking The Remediation At The Dickson Plant.**

*(1) Alper did not owe Claimants a duty of care by overseeing the Dickson Plant remediation.*

■ In the alternative, the Flake, Armstrong, and Adkins Claimants argue that Alper assumed a duty of care to them by assuming control of the Dickson remediation, which it breached by performing such remediation in a negligent manner. Claimants argue that Alper, under the auspices of the New Management Agreement, undertook to render environmental ser-

vices on behalf of Saltire, including with respect to the clean-up in Dickson County. (*See e.g.*, Armstrong Proof of Claim, Ex. A at 5.) Alper did recognize, or should have recognized, that this undertaking in Dickson County was necessary for the protection of third parties, and Alper failed to exercise reasonable care when carrying out this undertaking. (*Id.*)

■■■ Under Tennessee law, "one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all . . . ." *Nidiffer v. Clinchfield R.R. Co.*, 600 S.W.2d 242, 246 (Tenn.App.1980). This negative "Good Samaritan" rule is embodied in Section 324A of the Restatement, which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to [perform] his undertaking, if
>
> (a) his failure to exercise reasonable care increased the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.
>
> Restatement (Second) of Torts § 324A (1965).

Claimants' argument arises under subsection (b); their theory is that Alper undertook to perform a duty owed by Saltire to the neighbors of the Dickson remediation site.[2]

The Adkins and Armstrong Claimants allege in their proof of claims that, "Since Saltire had no employees and Alper was in the business of providing management services, the real nerve center of Saltire's remediation of the TCE contamination in Dickson, Tennessee was Alper." (Armstrong Proof of Claim, Ex. A at 6; Adkins Proof of Claim, Ex. A.) It is alleged by all three Claimants that Alper provided environmental clean-up services to the Saltire plant in Dickson County under the auspices of the New Management Agreement, in which Alper agreed to provide "supervision and management of various environmental matters, including risk assessment, risk management, technical assessment, risk management, technical assessment, remediation, legal and compliance." New Management Agreement at 2 ¶ 1(g).

The Adkins and Armstrong proofs of claim allege that, when Alper undertook to provide environmental services to Saltire, it should have appreciated that the Dickson region was a "Karst" zone, meaning that there is a heterogeneous flow of underground water. (*See* Armstrong Proof of Claim, Ex. A at 5.) When contaminants are released into ground water in such a geological zone, they can travel great distances and result in uneven concentrations of contaminants in wells throughout the surrounding area. (*Id.*) The Adkins and

---

**2.** The Armstrong and Adkins Claimants laid out this theory of recovery in the attachments to their proofs of claim. (Armstrong Proof of Claim, Ex. A; Adkins Proof of Claim, Ex. A.) The Flake Claimants, however, did not propound such an argument in their Complaint except to say "Defendants, either intentionally or negligently failed to adequately monitor, control, supervise and/or maintain the dispos-

al of the TCE at all locations throughout Dickson." (Flake Fourth Am. Compl. ¶ 31.) The Flake Claimants do, however, argue that in their response to Alper's objection to their Proof of Claim that Alper controlled the remediation of the Dickson Plant Contamination. (Flake Resp. to Alper Obj. to Flake Proof of Claim at 6.)

Armstrongs claim that Alper failed to appreciate the risk posed by the particular geological make up of the Dickson region when it conducted testing and remediation at the Saltire plant for TCE. Alper, they contend, failed to conduct effect sampling, use adequate equipment or come up with a comprehensive remediation plan for the entire Dickson area affected by the contamination. (*Id.* at 5–7.)

The Flake Claimants argue, in their response to Alper's objection to their Proof of Claim that Alper knew that TCE had entered the groundwater in the Dickson region and that it was migrating into the groundwater of the surrounding properties, including that of the Flake Claimants, but negligently failed to take any action to prevent such migration or to warn the public or Flakes of the contamination. (*See* Resp. to Alper Obj. to Flake Proof of Claim at 14.) The Flakes Claimants allege that Alper was liable for this because it controlled the remediation through the activities of dual employee Bauer, whose services were provided through the New Management Agreement. (*Id.* at 6–7.)

Alper argues that the mere existence of the New Management Agreement—even if Alper loaned Bauer to Saltire thereunder—does not render Alper liable under *Newmont,* 2007 WL 2405040 at *4, discussed *supra.*

Of course, there are differences between this case and *Newmont.* The New Management Agreement in this case specifically deals with the issue of environmental remediation and risk management, clearly contemplating the existence of environmental hazards and potential dangers to third parties. It contains a targeted section related to the clean-up at the Dickson plant. And *Newmont* was decided on a motion for summary judgment; because this is a motion to dismiss, I do not have the benefit of board minutes or evidence of the sort that was in the record in *Newmont.*

■ Nonetheless, I agree with Judge Lifland that the Claimants have failed to plead facts that would allow them to prevail on their claim under the so-called "Good Samaritan" rule. This is because Claimants' proofs of claim and their attachments are devoid of any facts that would, if proved, show that they relied on Alper's purported control over the Dickson remediation—or even that they were aware of it. "To establish 'good Samaritan' liability, therefore, appellants must show reliance ... the required reliance must be actual though not necessarily specific ... at a minimum [this] requires knowledge that the allegedly negligent inspection occurred before reliance can be found and 'good Samaritan' liability can attach." *Howell v. United States,* 932 F.2d 915, 919 (11th Cir.1991) *see Lemar v. United States,* 580 F.Supp. 37, 40 (D.Tenn. 1984) ("The essential element for recovery under § 324A and the 'good Samaritan' rule is reliance."). The failure to plead reliance is fatal to this claim.

*(2) Alper is not liable for failing to warn Claimants of the dangers caused by TCE contamination.*

■ It is undisputed that Alper was not involved with Saltire during the time of the initial TCE contamination. As discussed *supra,* Alper did not assume a duty to the Claimants by virtue of its handling of the Saltire remediation. Therefore, it cannot be said that Alper's conduct created a risk such that it was under any obligation to warn Claimants of the potential harm of the tainted water in Dickson County. *See, e.g., Satterfield v. Breeding Insulation Co.,* 266 S.W.3d 347, 362–63 (Tenn.2008).

### V. Alper Has No Indirect Liability To Claimants Under An Alter Ego Theory.

While the factual bases of their indirect liability claims differ, all of the Claimants argue that Alper should be held liable as the alter ego of its wholly-owned subsidiary, Saltire.

 The law on corporate liabilities is clear and unequivocal: "The fact that one corporation owns the controlling stock of another does not destroy the identity of the other corporation as a distinct legal entity; and, ordinarily, no liability may be imposed upon a parent corporation for the torts of its subsidiary." 18A Am.Jur.2d *Corporations* § 734 (2008); *see also Cargo Partner AG v. Albatrans, Inc.,* 352 F.3d 41, 45 (2d Cir.2003). The corporate form protects a parent shareholder from the liabilities of its subsidiaries even in the context of environmental liability. *See Bestfoods,* 524 U.S. at 61–62, 118 S.Ct. 1876. The only exception to this bedrock principle is if there is a reason to pierce the corporate veil. *Id.* at 62, 118 S.Ct. 1876.

Claimants argue that they should have an opportunity to demonstrate that, in this case, piercing the corporate veil is warranted. Alper counters that any alter ego claims that Claimants might assert are in fact derivative claims, which were the property of the Saltire estate in bankruptcy and were released and discharged in that proceeding. Claimants respond that the claims could not have been part of the bankruptcy estate because, under relevant law, Saltire was legally unable to pierce its own corporate veil in order to sue its parent company.

### A. Choice Of Law

 The first question is what law applies to the alter ego/veil piercing analysis. The answer is simple. Alper and Saltire are both Delaware corporations. Under New York choice of law principles, if both entities are incorporated in Delaware, Delaware law controls the alter ego analysis. *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir.1995); *Kalb, Voorhis & Co. v. Am. Fin. Corp.,* 8 F.3d 130, 132 (2d Cir.1993).

In *Kalb,* the Second Circuit considered an appeal from a decision of the district court dismissing a suit by a bondholder against the parent corporation of a bankrupt debtor seeking to collect payment on the bonds from the debtor's parent under an alter ego theory. The Second Circuit affirmed the lower court's decision under Texas law, the law of the debtor's state of incorporation, rather than applying the law of the states (i) where the debtor's obligations to the plaintiff were incurred, (ii) that governed the contract that formed the basis for the plaintiff's damages, or (iii) where the debtor's principal place of business was located. The Second Circuit reasoned, that because, "The issue is the limited liability of shareholders of a corporation" as opposed to the debtor's underlying liability, "The law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders." *Kalb,* 8 F.3d at 132.

The basis for Claimants' argument that the law of incorporation need not apply to an alter ego analysis is a single New York state court case, *Serio v. Ardra Ins. Co., Ltd.,* 304 A.D.2d 362, 761 N.Y.S.2d 1 (1st Dep't 2003). In *Serio,* the state court affirmed the trial court's decision to apply New York law when analyzing whether to pierce the corporate veil of a reinsurance company that was incorporated under the laws of Bermuda. The reinsurer was an "exempt" Bermudan corporation that was not authorized to sell insurance in Bermuda or to do business with Bermudan resi-

dents. It was controlled by an individual in New York. *Serio,* 304 A.D.2d at 362, 761 N.Y.S.2d 1. Crucial to the *Serio* court's choice of law analysis was the fact that the Bermuda court would not give full faith and credit to any New York judgment. Furthermore, Bermuda's interest in a determination of whether to allow the veil piercing of an "exempt" corporation that is not authorized to do business in Bermuda was far outweighed by the interests of New York in ensuring predictability of outcomes with respect to maintaining the integrity of the corporate form of entities incorporated in that county.

The instant case presents none of the concerns that motivated the decision in *Serio.* Delaware law applies to the veil piercing analysis.

### B. The Alter Ego Claims Of The Flake, Armstrong, Adkins And Holt Claimants All Fail.

All the Claimants have pleaded, in the alternative, that Alper is liable for damages they have suffered because it should be deemed Saltire's alter ego. Put otherwise, that the corporate veil between Alper and Saltire should be pierced.

The Flakes, Armstrongs and Adkins all contend that Alper is liable as Saltire's alter ego for damages suffered as a result of the remediation, because it was Alper who actually controlled the remediation, through its employee, Bauer. These Claimants' indirect/alter ego claim is actually no different than their direct liability claim against Alper—they take the same bare bones factual assertions and try to fit them into an alternative theory of liability.

The Holts argue that Alper is liable as Saltire's alter ego because it in effect "looted" Saltire, rendering it insolvent and unable to satisfy its liability for the Dickson contamination, which clearly occurred on its watch. They affirmatively plead the

following facts: (1) Saltire had no employees, officers, or board members separate from those of Alper; (2) Alper overburdened Saltire with debt and divested Saltire of most of its profitable businesses, leaving it inadequately undercapitalized; (3) Saltire was insolvent the entire time Alper was its parent; (4) Alper extracted millions of dollars from Saltire in fees for administrative services; (5) Alper caused Saltire to make a series of asset transfers to various Alper subsidiaries and affiliates with no benefit to Saltire, including intercompany loans in the millions of dollars; (6) routine corporate formalities and record-keeping practices were ignored; (7) the management and operational structures of Alper and Saltire overlapped; and (8) Alper treated Saltire as a facade. (*See* Holt Resp. to Alper Obj. to Holt Proof of Claim at 10–17.) From these facts they argue that Alper became liable to Saltire's creditors because it turned Saltire into a shell. (*Id.*)

Judge Lifland dismissed all of the alter ego claims—under any theory of liability— on the ground that veil piercing claims against Alper either did not rise to the level of "fraud or something like it" or had been discharged in Saltire's bankruptcy. I affirm on the latter ground, so I need not reach the former.

 Saltire's confirmed Reorganization Plan embodied a settlement between Saltire, Alper and Saltire's creditors' committee (in return for payment by Alper of $1 million to Saltire's estate). The Saltire release of claims provides in pertinent part:

> The Debtor ... acquits and forever discharges Alper ... from any and all actions, causes of action [and] liabilities ... in any way relating to the Debtor ... that the Debtor could assert directly or any Holder of a Claim ... could

assert derivatively or on behalf of the Debtor or its estate … Notwithstanding the foregoing, the above release does not release any claims any nondebtor third party may hold against any of the Released Parties, *except to the extent any nondebtor third party is asserting a claim that is property of the Debtor's Estate.* [Emphasis added]

In other words, Saltire released Alper from any claims that Saltire could have asserted against Alper directly or that any holder of a Claim against Saltire could have asserted derivatively on behalf of Saltire.

■ Section 541 of the Bankruptcy Code defines property of the estate as "legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Only causes of action held by the debtor at the commencement of the case are property of the estate that could have been litigated or settled by the bankruptcy trustee as the representative of the debtor's estate.

The Second Circuit applies a two-part test to determine whether a cause of action belongs to the bankruptcy trustee and is considered property of the estate: (1) the claim must be one that the trustee has a right to assert under the applicable state law; *and* (2) the claim must be general to the corporation rather than personal to the creditors. *See, e.g., Kalb,* 8 F.3d at 132; *St. Paul Fire & Marine Ins. Co. v. Pepsi-Co, Inc.,* 884 F.2d 688, 700–02 (2d Cir. 1989).

As discussed above, Delaware law is the relevant state law. Neither Alper nor the Claimants found any case applying Delaware law that addressed whether a trustee in bankruptcy of a Delaware corporation may bring an alter ego action on behalf of creditors of the debtor. Judge Lifland also found no such case. He ruled that a trustee had standing to bring an alter ego claim by analogy to decisions that interpreted Delaware law to allow a subsidiary to maintain an action against a corporate parent, to mean that a Delaware court would also permit a debtor corporation to assert a claim to pierce its own corporate veil. *See, e.g., Murray v. Miner,* 876 F.Supp. 512 (S.D.N.Y.1995); *Pereira v. Cogan,* 00–cv–619, 2001 WL 243537 (S.D.N.Y. Mar. 8, 2001).

However, all parties seem to have overlooked a 2005 decision of the Delaware bankruptcy court that dealt with the very question presented in this case. *In re OODC, LLC,* 321 B.R. 128 (Bankr.D.Del. 2005). In *In re OODC,* a Chapter 11 trustee brought adversary proceedings seeking to undo a leveraged buyout (LBO) by which the debtor corporation had acquired the assets of a number of companies. *Id.* at 133–34. The defendants asserted, *inter alia,* that the trustee could not prosecute claims personal to the creditors. The court disagreed. Applying the two-part test, it held that the trustee's allegation that all of the OODC creditors were harmed by the LBO amounted to a general claim and that "The parties have cited no state law which would bar such a suit by the Trustee or Debtor on behalf of all creditors." *Id.* at 136. The court thus ruled that the trustee had standing to pierce the corporate veil and bring alter ego claims on behalf of the creditors of the debtor. *Id.* at 136–37. Because OODC, the debtor, was a Delaware corporation, the court was necessarily applying Delaware law.

■ Therefore, under Delaware law, a trustee possesses standing to bring—and by logical extension, settle and release—an alter ego claim on behalf of a creditor of the debtor, as long as the claim qualifies as a "general" claim.

The bankruptcy court correctly concluded that the alter ego claims alleged against Alper were "general" and so were property of Saltire's estate. None of the Claimants' factual allegations suggest that Alper's actions in relation to Saltire were specific to any Claimant. If indeed Alper looted Saltire and rendered it insolvent, as the Holts contend, its actions harmed all of Saltire's creditors equally. Similarly, even if Alper, while in control of the Dickson remediation, took action that increased the damage resulting from the Dickson contamination, there is no allegation in the Flake, Armstrong, or Adkins proofs of claim or their attachments thereto that Alper's or Bauer's actions were directed toward their specific properties or caused them unique harm that other landowners did not suffer. Accordingly, the alter ego claims asserted by the Claimants are general claims that could have been asserted by any creditor and were owned by Saltire. *See Kalb*, 8 F.3d at 132.

■■■■ The Holt Claimants also argue, for the first time on this appeal, that "Saltire participated in the corporate looting that underlies the Holt Claimants' alter ego claims"—i.e., Saltire was *in pari delicto* with Alper—and, therefore, the alter ego claims could not have been released by Saltire because Saltire was barred from asserting such claims against Alper in the first instance. Although generally a district court will not consider arguments not raised in the bankruptcy court below, the prohibition is not absolute. *In re Chateaugay Corp.*, 165 B.R. 130, 134 (S.D.N.Y. 1994). In any event, there is no merit to the Holt Claimants' argument because "the *in pari delicto* defense does not apply to [ ] actions [where] the essential element of such claims is that a controlling shareholder forced the corporation to act for the benefit of the shareholder through domination and control." *Kalb*, 8 F.3d at 133

("where the parties do not stand on equal terms and one party controls the other, the *in pari delicto* doctrine does not apply"). Because the Holt Claimants allege that Alper dominated and controlled Saltire, the *in pari delicto* doctrine would not bar the debtor subsidiary from asserting the alter ego claim. *See id; see generally Ross v. Bolton*, 904 F.2d 819, 824–26 (2d Cir.1990).

Further, Delaware courts have never held that the doctrine of *in pari delicto* bars "relief to the innocent by way of a derivative suit," even in cases that involved concerted activities of company insiders. *See Trenwick Am. Litig. Trust v. Ernst & Young*, 906 A.2d 168, 212 n. 132 (Del.Ch. 2006). The principle behind the *in pari delicto* doctrine—that a fellow wrongdoer should not profit from the recovery awarded by the court for that wrong—"loses its sting" when the wrongdoer will not be able to share in the corporation's recovery. *Id.* (*citing Scholes v. Lehmann*, 56 F.3d 750 (7th Cir.1995) (internal quotation marks omitted).) The rationale for the *in pari delicto* doctrine is similarly blunted when applied to Saltire's ability to settle and release alter ego claims against Alper since Saltire's creditors, and not Saltire, would share in any recovery from a veil piercing suit.

## VI. The Bankruptcy Court Properly Exercised Its Discretion In Denying The Flake Claimants' Requests For (i) Discovery And (ii) To Further Amend Their Claims.

■■■ A trial court enjoys wide discretion in its handling of pre-trial discovery, and its rulings with regard to discovery are reversed only upon a clear showing of an abuse of discretion. *In re DG Acquisition Corp.*, 151 F.3d at 79; *see also Am. Sav.Bank, FSB v. UBS PaineWebber, Inc.*

*(In re Fitch, Inc.)*, 330 F.3d 104, 108 (2d Cir.2003).

It was well within the bankruptcy court's discretion to deny the Flake Claimants' request for discovery before the claim objection was heard. The bankruptcy court found that the claim objection was essentially a motion to dismiss the Flakes' claims, and thus denied the Flakes an opportunity to conduct discovery prior to responding to the claim objection. The Flake Claimants argue that Alper simply characterized its claim objection as a motion to dismiss to avoid discovery, despite the fact that it filed the Fink Declaration, which contained several pages of evidentiary material. As discussed *supra*, I do not find that the bankruptcy court relied on factual allegations made by Alper that did not appear in the Flake Proofs of Claim or the attachments thereto to make its decision. Any extraneous factual allegations that were referenced in the Judge Lifland's January 15, 2008 Opinion (e.g., that the existence of TCE contamination in Dickson County was "widely known" since the mid–1980's and the circumstances under which Alper acquired Saltire) were not necessary to the court's holding.

■ Likewise (although not specifically challenged in the Flake briefing on appeal), the bankruptcy court did not abuse its discretion in denying the Flake Claimants' request to amend their claims after the bankruptcy court disallowed and expunged the claims. The Flakes filed a complaint, four amended complaints, the Original Flake Claims, and the Amended Flake Claims and the Response thereto. A further amendment by the Flake Claimants would have been their ninth attempt to state a claim against Alper.

Therefore, Judge Lifland's decision to deny the Flake Claimants an opportunity for discovery or additional chances to amend their claims is affirmed.

*CONCLUSION*

The decision of the bankruptcy court is affirmed in all respects.

This constitutes the decision and order of the court.